416 F.2d 467
 Donald Lester JAMES, Ivan Orrels, Dewey D'Angelo, Alice
Dianne Whitmire, Raymond Leroy Rolling, Jack
Edward Kress, and Harvey Hutton
Hutchins, Appellants,
v.
UNITED STATES of America, Appellee.
 No. 26162.
 United States Court of Appeals Fifth Circuit.
 Sept. 17, 1969, Rehearing Denied Oct. 31, 1969.
 
 1
 Jack Wasserman, Washington, D.C., Michel Maroun, Shreveport, La., for appellants James, Orrells, D'Angelo, Kress, and Whitmire.
 
 
 2
 John M. Sekul, Biloxi, Miss., for appellant Rolling.
 
 
 3
 Harvey H. Hutchins, pro se.
 
 
 4
 Robt. E. Hauberg, U.S. Atty., Jackson, Miss., Owen A. Neff, Criminal Div., Charles Ruff, Joseph Tafe, Attys., Dept. of Justice, Washington, D.C., for appellee; Jill Wine Volner, Atty., Dept. of Justice, Washington, D.C., of counsel.
 
 
 5
 Before JOHN R. BROWN, Chief Judge, DYER, Circuit Judge, and HUNTER, District Judge.
 
 EDWIN F. HUNTER, Jr., District Judge:
 
 6
 Appellants were tried by a jury under a four-count indictment charging them with conspiracy to violate and substantive violations of 18 U.S.C.A. 2, 371 and 1952.
 
 
 7
 Count One charged that defendants conspired in violation of 18 U.S.C.A. 371 to use certain facilities in interstate commerce with intent to carry on an unlawful gambling enteprise in violation of Sections 1952 and 2 of 18 U.S.C.A. The alleged conspiracy included the use of trailer facilities of U-Haul Trailer Company between Oklahoma and Mississippi for the purpose of transporting in interstate commerce a 'Juice joint' to control dice games conducted in violation of Mississippi law. The alleged conspiracy also included the interstate use of the mails to cash gambling checks. All appellants except Orrels were found guilty on this count.
 
 
 8
 Count Two charged five appellants (Whitmire and Hutchins not included) with causing the use of U-Haul Trailer facilities in interstate commerce to transport electromagnets from Oklahoma to Mississippi, to be used at the Red Carpet Club and Deano's Lounge in Biloxi to control dice games conducted in violation of the gambling laws of Mississippi. Appellant Rolling was found not guilty of this charge. Four appellants-- Jack Kress, Dewey D'Angelo, Donald James and Ivan Orrels-- were found guilty. Count Three charged Bennett, D'Angelo and Harry Hutchins used the United States mails by causing the Gulf National Bank in Gulfport, Mississippi to place in the mails for collection checks drawn by John Turner on an Iowa bank with the intent to carry on an unlawful gambling enterprise in violation of Sections 1952 and 2 of 18 U.S.C.A. Only Hutchins was found guilty. Count Four charged D'Angelo and Whitmire with using the mails by causing the same bank to place in the mails checks drawn by Harold Holt on a Tennessee bank with the intent to carry on an unlawful gambling enterprise in violation of the same statutes.
 
 
 9
 Appellants assert numerous errors. The conclusion of their brief reveals the vigor of their attack upon the convictions:
 
 
 10
 'CONCLUSION'
 
 
 11
 'This was no ordinary prosecution but rather one where the Government sought to indict and convict by means fair or foul. The proceedings before the grand jury were accompanied by misconduct on the part of the prosecution and followed by an improper press release, the indictment was prejudicially conceived and framed, the defense preparation for trial was marred by governmental interference, the evidence introduced at the trial was the product of illegal search and seizure, appellants were tried by unfair utilization of hearsay and admissions received in evidence without affording appellants the rights protected by the Sixth Amendment, the Government's closing arguments were permeated by unfairness and then to climax this pyramid of prejudice and unfairness, a confusing and erroneous charge was delivered to the jury. Convictions procured in this fashion should not be permitted to stand. We urge reversal.'
 
 
 12
 From our review of the record before us we cannot see any indication that appellants have been the victim of miscarried justice. The facts proved against them made the verdict inevitable. We affirm.
 
 
 13
 Able counsel have thoroughly argued and briefed their contentions. These will be treated separately, but first we shall detail some of the evidence giving rise to this prosecution so that appellant's allegations of error may be placed in proper perspective. The evidence is to be viewed in the light most favorable to the jury verdict. Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680.
 
 SUMMARY OF EVIDENCE
 
 14
 The Government's witnesses consisted of eleven F.B.I. agents, four state officials and thirty-one additional witnesses, together with some forty-three exhibits. The evidence reveals that a gambling casino, the Red Carpet Club, was opened in Harrison County, Mississippi, in November of 1964. It was located in the former home of Harry Bennett, who was indicted as a co- conspirator but died before trial. Defendant D'Angelo was the record owner of the club. Defendant Rolling owned an interest as a result of a $7,500 loan made to Bennett. Defendant James owned a ten percent interest. D'Angelo managed the 'front room' of the casino. Rolling was in charge of the dice table. Business at the Red Carpet Club was poor, and in December, 1964, Bennett and James discussed the possibility of placing a device to the gambling table to control the roll of the dice. Defendant Kress came to the club and met with Bennett at that time, and when he returned in January of 1965, Maurice Arnold, the club's maintenance man, was told by Bennett and Kress that they wanted him to install a heavy-duty voltage meter in his shop at the rear of the club, using the name of his own company, Modernistic Industries. Early in March, 1965, Robert Bennett, Harry's son and also an unindicted co-conspirator, had a conversation with D'Angelo. D'Angelo told him about the proposed installation of the control device and showed him a business card with Kress's name on it. A day or two later, Harry Bennett showed a similar card to his son and told him that he was willing to pay $15,000 for such a device. James and Orrels traveled in James's car to Tulsa, Oklahoma. They rented a heavy-duty U-Haul trailer for a one-way trip to Gulfport. They then picked up from Kress's business premises a number of heavy steel plates and wire coils and transported these items from Tulsa to Gulfport. Robert Bennett informed his father that he and Hutchins were planning to go to New Orleans, and Harry Bennett asked his son to pick up a concrete saw for Maurice Arnold. The saw was obtained and Maurice Arnold attempted to use it during the morning of March 19th to cut holes in the floor of the Red Carpet Club underneath the dice table. Present at that time were the defendants James and Rolling. When it was realized that the concrete saw would not enable them to cut sufficiently large holes to hold the steel plates, Arnold and James drove to Gulfport and rented an air hammer to finish the job. The plates and coils were removed from the trailer by James, Rolling, Arnold and two assistants, and when the holes under the table had been cut, the equipment was placed in them and wires connected from an electric power source. The electromagnets thus created constituted the operative part of a device commonly known as a 'juice joint,' the purpose of which was to control the roll of the dice.
 
 
 15
 The Red Carpet people encountered considerable difficulty in collecting on checks cashed by its customers. Those who came to gamble would cash sizable checks for that purpose and some would stop payment on their return home or would have insufficient funds in their accounts. Hutchins suggested the creation of an independent organization to cash the checks. Hutchins and Robert Bennett set up a company with Hutchins as president and Jean Proctor, an unindicted co-conspirator, as secretary. Hutchins and Robert Bennett were to receive two and one-half percent of the value of the checks handled as their commissions. The Check Cashing Service account was opened in March, 1965, by Hutchins, and it remained active, to a greater or lesser extent, until November, 1965. The use of the mails to transmit the checks cashed by customers of the Red Carpet Club (and of Deano's Lounge) was charged as an element of the conspiracy in Count One of the indictment and as an element of the substantive offenses in Counts Three and Four. Considerable evidence was adducted concerning specific instances of the cashing of checks for customers from outside Mississippi. Typical of the testimony given by the customers was that of John Shipley, who testified that he cashed a number of checks on Louisiana and Alabama banks but that, having concluded that the dice he had been playing with were loaded, he stopped payment.
 
 
 16
 The Red Carpet Club was closed by a local injunction in June of 1965. Bennett, D'Angelo and Rolling decided to move the gambling operation to a new location. Accordingly, on August 3, 1965, D'Angelo leased an empty restaurant across the street from the Red Carpet. Harry Bennett put up the money to remodel it for use as a gambling casino. Bennett was to receive forty percent of the profits from the new operation (Deano's Lounge); D'Angelo was to receive twenty percent, and Rolling was to receive ten percent. Several months later Arnold, Rolling and others moved the 'juice joint' from the Red Carpet Club to Deano's Lounge. Arnold and Rolling tested the device. It worked satisfactorily for some three or four days. The main switch caught fire. Arnold called Kress in Tulsa and told him about the fire. Two weeks later Kress brought a new switch. He visited Harry Bennett in the latter's office and tried to persuade Bennett to invest sufficient money in the 'juice joint' to insure that it would work efficiently, but Bennett refused to spend any more. Friction developed between Bennett and D'Angelo. D'Angelo bought out Bennett's interest in Deano's and decided to set up a new system of check collection. On October 4, 1965, he sent defendant Whitmire to the bank to open an account under the name of A. D. Marks. Whitmire, who had worked at the Red Carpet Club and was employed in the same capacity at Deano's was paid an additional commission of ten percent of the value of the checks she handled. On November 22, 1965, the Sheriff of Harrison County, having been informed by the Federal Bureau of Investigation that a juice joint was operating in Deano's Lounge, called defendant D'Angelo to his office and told him that he wanted the device removed. The next morning at six o'clock a deputy sheriff went to Deano's and removed the magnetic plates. On that same day D'Angelo handed over to Special Agent Graben a quantity of dice, two pairs of which were magnetized and a number of mis-spotted pairs.
 
 COMPOSITION OF THE JURY
 
 17
 There is no merit to the argument that grand and petit jurors were selected in an unconstitutional manner because the Jury Commission positively considered the race of Negroes in an effort to achieve a jury list which represented a fair cross-section of the community. The Clerk testified that the jury array which was summoned consisted of 52% Women and 33 1/3% Negroes. These percentages conform to the identical proportions that women and Negroes appeared at the last census. This Court, sitting in banc, has implicitly approved just such a system as was used here by the Clerk of the District Court for the Southern District of Mississippi. Brooks v. Beto (5th Cir. 1966), 366 F.2d 1, cert. denied 386 U.S. 975, 87 S.Ct. 1169, 18 L.Ed.2d 135 (1967).
 
 THE SUFFICIENCY OF THE INDICTMENT
 
 18
 Appellants filed timely motions to quash the indictment on the grounds that it did not charge with reasonable certainty the nature of the Mississippi gambling offense which appellants are alleged to have violated. All that is required under Federal Rules of Criminal Procedure 7(c) is that the indictment be a plain, concise and definite written statement of the essential facts constituting the offense charged. An indictment is deemed valid when it informs the accused of the offense with which he is charged with sufficient specificity to enable him to prepare his defense and to avoid the hazard of the accused being prosecuted for the same offense. Rood v. United States (8th Cir. 1965), 340 F.2d 506, cert. denied 381 U.S. 906, 85 S.Ct. 1452, 14 L.Ed.2d 287. We are convinced that this indictment, framed in the terms of the statute, measures up to that standard. Gilstrap v. United States (5th Cir. 1968), 389 F.2d 6, cert. denied 391 U.S. 913, 88 S.Ct. 1806, 20 L.Ed.2d 652 (1968); Turf Center, Inc. v. United States (9th Cir. 1963), 325 F.2d 793. The indictment makes reference to dice, to the interstate transportation of a juice joint, and to the cashing of gambling checks. Surely defendants knew or should have known what section of the Mississippi statute was allegedly violated. The district court's ruling which denied the motion to dismiss the indictment was correct.
 
 THE DENIAL OF KRESS' MOTION TO SUPPRESS
 
 19
 Kress sought by pre-trial motion and at the trial to suppress various items seized at his home and manufacturing plant in Tulsa, Oklahoma on July 21, 1966. He was arrested at 7:30 A.M. on the same date. Identical affidavits had been prepared the same day. These furnished the basis for three warrants to search and seize property at the home, manufacturing plant and in the automobile of Kress. His counsel argues that the search was a general exploratory one in violation of the Fourth and Fifth Amendments, and that probable cause was not demonstrated in the affidavits. We do not agree. The search was for the instrumentalities involved. It was not general. It was not exploratory. The place to be searched and the items to be seized were as precisely identified in the warrant as the nature of the activity permitted. When circumstances make an exact description of instrumentalities, a virtual impossibility, the searching officer can only be expected to describe the generic class of items he is seeking. Spinelli v. United States (8th Cir. 1967), 382 F.2d 871, reversed on other grounds, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). The fact that the warrant described the articles to be seized as 'gambling paraphernalia, including but not limited to dice, crap tables, wires, magnets, coils, solenoid switches, records, sales receipts, customers' lists, shipping orders, supplies, machine equipment, machine tools and hand tools for the manufacture of gambling paraphernalia, including but not limited to dice, crap tables and cards,' etc., did not make the description vague and insufficient.
 
 
 20
 Probable cause was amply demonstrated in the affidavits. The Commissioner, before issuing the search warrants, was given more than sufficient facts from a highly credible source to justify the belief that probable cause existed. The affidavit by an F.B.I. agent identified the informant as a special attorney from the Department of Justice. The Source of the informant's hearsay information was sworn testimony by witnesses before a federal grand jury being conducted by the informant one day before the affidavit was sworn. In addition, the background information contained in the affidavit, based on the affiant's firsthand knowledge and current information, corroborates and supports the informant's conclusions. The district court properly denied defendant's motion to suppress.
 
 THE MULTIPLE CONSPIRACY ISSUE
 
 21
 The indictment alleges a single conspiracy in a single count. Various overt acts were specified. Appellants argue that the evidence reveals not one conspiracy, but four, and that for this reason a judgment of acquittal on Count One should have been directed. Reliance is placed on Kotteakos v. United States (1946), 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557. There, the Supreme Court found that substantial prejudice resulted to a single defendant when he and thirty others and eight separate conspiracies were intertwined under a single general indictment, thus making it impossible to adequately prepare a defense, and confusing the jurors to such an extent that they subconsciously transferred guilt from person to person. Nothing comparable exists here. The Supreme Court has severely limited the applicability of Kotteakos in the case of Blumenthal v. United States (1947), 332 U.S. 539, 68 S.Ct. 248, 92 L.Ed. 154. In Blumenthal, the indictment charging a conspiracy among two men, who acted as the distributors for liquor owned by a third unknown man, and three others who sold that liquor to a number of tavern owners. The distributors provided cases of the liquor to the salesmen who in turn sold it to the tavern owners at a price on its face below the legal maximum, but the tavern owners surreptitiously paid the salesmen an additional illegal amount, part of which was kept by the distributors and part of which was transmitted by them to the hidden owner. The salesmen did not know of the existence of the actual owner of the liquor they were selling, and each of the three operated individually in their dealings. The Supreme Court found that, although in a hypertechnical sense the evidence might be regarded as showing two agreements, the unique facts revealed a single overall conspiracy of which both agreements were essential and integral steps. In so ruling the court used this pertinent language:
 
 
 22
 'Indeed that may be what took place chronologically, for conspiracies involving such elaborate arrangements generally are not born full grown. Rather they mature by successive stages which are necessary to bring in the essential parties. And not all of those joining in the earlier ones make known their participation to others later coming in.
 
 
 23
 'We think that in the special circumstances of this case the two agreements were merely steps in the formation of the larger and ultimately more general conspiracy. In that view it would be a perversion of justice to regard the salesmen's ignorance of the unknown owner's participation as furnishing adequate ground for reversal of their convictions. * * * By their separate agreements, if such they were, they became parties to the larger common plan, joined together by their knowledge of its essential features and broad scope, though not of its exact limits, and by their common single goal.' Blumenthal, 322 U.S. at 556-558, 68 S.Ct. at 256, 257.
 
 
 24
 Here, as in Blumenthal, it is the common goal which provides the continuing theme of the conspiracy. The evidence supports a finding that those present at the beginning as well as those remaining at the end, and those who participated in between, intended to establish a gambling enterprise and to promote that enterprise in a variety of ways through the use of facilities in interstate commerce.
 
 
 25
 THE MOTION TO DISMISS FOR MISJOINDER OF PARTIES; THE MOTION FOR SEVERANCE
 
 
 26
 Appellants insist that the district judge erred in failing to grant their motions for severance, both as to the joinder of offenses and to joinder of defendants. Under Rule 8(a) of the Federal Rules of Criminal Procedure, joinder of offenses is ordinarily appropriate where, as here, the offenses arose out of a series of connected acts, and the evidence as to each count, of necessity, overlaps. The contention here in support of an 8(a) severance hinges entirely on the assertion that the proof showed separate conspiracies. The record demonstrates the fallacy of that proposition. Vol. 8, Moore, Federal Practice, 8.05(2), pp. 8-19, 2nd Ed. of 1968; Johnson v. United States (8th Cir. 1966), 356 F.2d 680, 682. Similarly, there was no misjoinder of defendants. Rule 8(b) of the Federal Rules of Criminal Procedure expressly permits joinder if defendants 'are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. A conspiracy count may be joined with the substantive offenses which are its objects. Chadwick v. United States (5th Cir. 1941), 117 F.2d 902, cert. denied 313 U.S. 585, 61 S.Ct. 1109, 85 L.Ed. 1541, Rule 8(b) specifically states that 'all of the defendants need not be charged in each count.'
 
 
 27
 Having found that there was no misjoinder of offenses or defendants under Rule 8, there remains the question of whether defendants were prejudiced so as to require a severance under Rule 14. Tillman v. United States (5th Cir. 1969), 406 F.2d 930. The existence of prejudice, in large part, depends upon the facts of the individual case. Flores v. United States (5th Cir. 1967), 379 F.2d 905, and the granting or rejecting of a motion to sever rests very much in the discretion of the trial judge. Smith v. United States (5th Cir. 1967), 385 F.2d 34, 37. The defendants must prove something more than the fact that 'a separate trial might offer a better chance of acquittal.' Tillman v. United States (5th Cir. 1969), 406 F.2d 930, 935. The issues in this case were not complex and were clearly presented to the jury. Any prejudice resulting from the joint trial is at best speculative. Accordingly, we hold that a severance under Rule 14 was not required.
 
 
 28
 DOES BRUTON REQUIRE REVERSAL?
 
 
 29
 In Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476, a confession of a co-defendant who did not take the stand was used against Bruton. The Supreme Court concluded that this constituted a deprivation of his rights under the confrontation clause of the Sixth Amendment. The Government concedes that certain admissions of co-conspirators were admitted into evidence under instructions limiting their application to the declarants. The Government does not concede that the admission of those statements constituted reversible error.
 
 
 30
 The only statement of a co-conspirator which mentioned appellant Kress directly was that of appellant D'Angelo made to Paul Brown. D'Angelo told him that he sent for Kress to fix the controls on the 'juice joint' and paid him for the trip. The evidence linking Kress to the conspiracy and to the substantive offense charged in Count Two was produced by a horde of independent witnesses. Kress installed the wiring for the device and tested it; Kress repaired the device and shipped new parts; he shipped magnetized dice for use with the 'juice joint,' all of which firmly established him as a member of the conspiracy from its inception; if no proof of his implication with the later stages of the conspiracy had been introduced he would still have been properly convicted.
 
 
 31
 No statement by co-conspirators referring to Hutchins or Rolling either directly or indirectly were testified to by third parties.
 
 
 32
 The only statement of a co-conspirator which made reference to D'Angelo was that of Whitmire. No claim under Bruton is available, however, because Whitmire took the stand and was thus subject to cross-examination. Santoro v. United States (9th Cir. 1968), 402 F.2d 920; Rios-Ramirez v. United States (9th Cir. 1968), 403 F.2d 1016. The only statement of a co-conspirator implicating James was made by Orrels to Special Agent Dukes. He admitted that he went to Tulsa and returned to Mississippi with an unidentified companion. The details of his statement would have permitted the jury to infer that the second man was James. James' own statement to Special Agent Toole repeated the details of the trip, and independent testimony established his role in delivering and unloading the 'juice joint.' The statement of James, testified to by Special Agent Toole, although making no direct reference to the fact that another person accompanied him, was sufficiently linked to other testimony to enable the jury to infer that the trip was the same one in which appellant Orrels participated. Orrels' own statement describing exactly the same events was testified to by Special Agent Dukes. It was corroborated by other independent testimony. Paul Brown testified that D'Angelo had told him that appellant Whitmire was handling the checks at Deano's Lounge. Appellant Whitmire took the stand and admitted her connection with the Marks account, and in light of the independent testimony of the bank president and corroborative documentary evidence, no substantial right of this appellant was prejudiced by that single reference.
 
 
 33
 Our judgment must be, and is, based on our own reading of this record and on what seems to us to be the overwhelming independent evidence in support of the jury's verdict. Applicable here is the language of the Supreme Court in speaking of the evidence in Harrington v. California, 89 S.Ct. 1726, 23 L.Ed.2d 284 (June 2, 1969);
 
 
 34
 'It is so overwhelming that unless we say that no violation of Bruton can constitute harmless error, we must leave the state conviction undisturbed.'
 
 THE JUDGE'S CHARGE
 
 35
 Appellants press upon the contention that the instructions of the trial court were so erroneous and confusing as to constitute grounds for reversal. We have carefully reviewed the instructions and cannot agree. The judge's charge that 'proof beyond a reasonable doubt is established if the evidence is such as you would be willing to rely and act upon in the most important of your own affairs' consistently has been upheld as not being reversible error. Holland v. United States (1954), 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150; United States v. Nuccio (2nd Cir.), 373 F.2d 168, cert. denied 387 U.S. 906, 87 S.Ct. 1688, 18 L.Ed.2d 623 (1967); United States v. Restaino (3rd Cir. 1966), 369 F.2d 544; United States v. Wright (7th Cir. 1967), 365 F.2d 135, cert. denied 386 U.S. 918, 87 S.Ct. 879, 17 L.Ed.2d 789 (1967). It is true that the Supreme Court in Holland stated under similar circumstances that it would have been best if this section of the charge had been in terms of the kind of doubt that would make a person hesitate to act rather than the kind on which he would be willing to act. In reviewing the charge on reasonable doubt we look to the whole instruction rather than isolating our attention to one sentence. Baker v. United States (5th Cir. 1969), 412 F.2d 1069, June 20, 1969. When this is done it is seen that the district court properly and completely defined reasonable doubt. None of the other contentions as to the charge warrants more than the statement that each has been considered and found to be without merit.
 
 THE GRAND JURY TESTIMONY
 
 36
 Appellant's next argument is that the trial judge erred in refusing to make available for inspection the grand jury testimony of Robert Bennett and Maurice Arnold. Both were named as co-conspirators. Defense counsel sought this testimony by pretrial motion and timely requested the production of the grand jury statements at the close of the testimony of each witness. In each instance the district judge denied access after an in camera inspection and a finding that there was no material inconsistencies. Defense counsel insist that the court's action is contrary to Dennis v. United States (1966), 384 U.S. 855, 86 S.Ct. 1840, 16 L.Ed.2d 973, as interpreted by United States v. Youngblood (2nd Cir. 1967), 379 F.2d 365, and Allen v. United States (1968), 129 U.S.App.D.C. 61, 390 F.2d 476. It is true that the appellate court citations urged upon us seem to have formulated a rule to the effect that a showing of 'particularized need' as required by Dennis is no longer a prerequisite to disclosure of a witness's grand jury testimony after he has testified at trial, but this court has made it clear that the test of particularized need must be met before the secrecy of the grand jury may be breached. Nolan v. United States (5th Cir. 1968), 395 F.2d 283; Stassie v. United States (5th Cir. 1968), 401 F.2d 259; White v. United States, 415 F.2d 292 (5th Cir., June 18, 1969).[1] Appellants' request was made without showing that the testimony was material to their defense, and therefore is distinguishable from United States v. Hughes, 413 F.2d 1244 (5th Cir., June 2, 1969). Besides, as to each of these witnesses, defense counsel had available Jenks Act material and made the fullest use of it with extensive cross-examination. The trial judge here complied to the fullest extent with the practice specially approved by this Court in Menendez v. United States (5th Cir., 1968), 393 F.2d 312.
 
 THE DICE TABLE
 
 37
 A table seized at the plant of Jack Kress contained an electric coil embedded between the boards of the table surface. This was not the identical type of electric coil embedded in the floor of the Red Carpet Club. It was never marked as an exhibit but was used as a visual aid for illustration during the testimony of two government witnesses. Appellants rely on United States v. Adams (2nd Cir. 1967), 385 F.2d 548, to support their argument that it was error to permit the jury to see this table with a juice joint which was not introduced in evidence. Adams held it error to send to the jury room an envelope containing incriminating writings made by narcotics agents while making purchase of cocaine which had not been received in evidence. Three obvious facts distinguish Adams: (1) The exhibit was in writing and was hearsay which would have been inadmissible if offered in evidence, unlike the instant case wherein the dice table was merely demonstrative evidence to illustrate the testimony; (2) The envelope's contents were never mentioned during the trial but were seen by the jury for the first time during their deliberations; (3) appropriate objections were made at the time. In the instant case no objections, except as to relevancy, were made at the time the table was brought into the courtroom or during the relevant testimony. The testimony, by itself, was admissible, and permitting the jury to see a dice table during testimony describing it surely would not constitute reversible error.
 
 PROSECUTOR NEFF BEFORE THE GRAND JURY
 
 38
 The assertion that the prosecution improperly influenced the Grand Jury is premised on the fact that Prosecutor Neff, in the presence of a grand jury, advised appellant Rolling, who had been subpoenaed as a witness, that his conduct was the equivalent of robbery, except that he used an electromagnet rather than a gun. Granting that the remark exceeded standards of propriety, the prejudice claimed by appellants just cannot be substantiated when it is realized that the indictment returned by the grand jury before whom the remark was made was not the indictment on which appellants were tried. A different grand jury returned the indictment at issue here. It knew of the prior true bill, but knew nothing of the description of Rolling as a 'robber.'
 
 
 39
 Appellants also argue that the 'due administration of justice' was impeded by a one-paragraph press release by Mr. J. Edgar Hoover, which essentially repeated only what was contained in the indictment. This press release was issued 18 months before trial. Continuing their general theme that the government sought to convict by means 'fair or foul,' appellants assert that the prosecutor deliberately went beyond strict rebuttal and made an argument that covered the whole case. Appellants point to no specific elements of the government's rebuttal which they claim were prejudicial. The trial judge found the argument to be fair and responsive. In reviewing the transcript, we do not find the argument of the prosecutor to be of such a nature as to warrant reversal.
 
 
 40
 Other points urged by appellants have been considered but do not warrant discussion.
 
 
 41
 Affirmed.
 
 
 
 [1]
 Literally Rule 16(b) allows discovery on a specified showing, but on the principle that the specific controls over the general, it would seem that a motion to inspect grand jury testimony should be under Rule 6(e) rather than 16(b). (See Fed. Practice and Procedure, Wright 1969 Ed. pg. 180)