534 P.2d 1126

**STATE of New Mexico, Plaintiff-Appellee,**

v.

**Frank QUINTANA, Defendant-Appellant.**

**No. 1612.**

Court of Appeals of New Mexico.

April 2, 1975.

Certiorari Denied May 1, 1975.

J. E. Gallegos, Susan P. Graber, Jones Gallegos Snead & Wertheim, P. A., Santa Fe, for defendant-appellant.

Toney Anaya, Atty. Gen., George A. Morrison, Sp. Asst. Atty. Gen., Jay F. Rosenthal, Asst. Atty. Gen., Santa Fe, for plaintiff-appellee.

## OPINION

HERNANDEZ, Judge.

Defendant appeals his jury conviction for trafficking in heroin contrary to Section 54-11-20, N.M.S.A.1953 (Repl. Vol. 8, pt. 2, 1973 Supp.). He alleges two points of error:

1. THE TRIAL COURT ERRED IN DENYING DEFENDANT'S MOTION TO QUASH THE SEARCH WARRANT AND TO SUPPRESS REAL EVIDENCE.

2. THE TRIAL COURT ERRED IN DENYING DEFENDANT'S MOTION FOR A DIRECTED VERDICT AS TO THE OFFENSE OF "TRAFFICKING IN HEROIN" BECAUSE THERE IS NOT SUBSTANTIAL EVIDENCE TO SUPPORT A CONVICTION FOR "TRAFFICKING."

We affirm.

The facts are these: On December 7, 1972, several law enforcement officers, both city and state, went to the headquarters of the El Vicio Methadone Maintenance Program at 331 Garfield Street in Santa Fe for the purpose of executing a search warrant. The officers arrived in an unmarked car at approximately 6:30 a. m., drove around the block to observe any activity on the premises or in the neighborhood and then returned to the front of the building, parked and waited. At about 6:45 a. m., defendant arrived, parked his car, and entered the building. When the officers saw the defendant approach the building they got out of their vehicle and walked toward him. Their testimony indicates that they intended to reach him before he went into the building. There is no evidence that defendant either saw or was aware of the presence of these officers; and upon entering the building, he locked the door behind him. State Police Officer Ortiz, who was in charge of the search party, reached the two steps leading to the door just as the defendant was locking it; and when he knocked, the defendant turned and looked at him through a small window in the door. The Officer identified himself and told defendant that he had a warrant to search the premises. Defendant responded through the door that he did not want to open the door. He then turned and walked very rapidly to the opposite side of the entry room.

The room was rectangular in shape measuring approximately 18 x 20 feet. Through the window in the door, Officer Ortiz observed the defendant squat down in front of a gas heater, put his right hand in his right coat pocket and remove "what appeared to be aluminum foil." He next saw the defendant place his left hand in the other coat pocket and then throw whatever he had in both hands under the heater. At that moment the officers forced the door open and entered the building. Officer Ortiz went directly to where the defendant was squatting and reiterated his identity and purpose. Officer Ortiz then searched under the heater and retrieved two large aluminum foil packets. An examination of the packets disclosed that one contained three smaller packets, each of which con-

tained approximately one gram of heroin. The other packet contained 30 smaller packets of heroin.

The biochemist's analysis of random samples taken from the contents of all the packets demonstrates that they contained heroin. There is no evidence as to the total weight nor as to the purity of the heroin confiscated.

Defendant's first point asserts that the search warrant fails to describe with particularity the items to be seized and therefore constitutes a general warrant in contravention of the Fourth Amendment to the Constitution of the United States which provides:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

The search warrant reads in pertinent part:

"NOW, THEREFORE, YOU ARE HEREBY COMMANDED to make an immediate search anytime between the hours of 6:00 a. m. and 10:00 p. m. of the building described above and any appurtenant structures thereto and *any and all automobiles* which may be found on the premises at the time of the search and *of any persons* who may enter upon said premises or may be found there at the time of the search for *any and all controlled substances which may be kept there contrary to law* . . ." [Emphasis ours.]

Section 54–11–2 (E), N.M.S.A.1953 (Repl. Vol. 8, 1973 Supp.) defines controlled substances as follows:

" . . . 'controlled substance' means a drug, substance or immediate precursor listed in Schedules I through V of the Controlled Substances Act or regulations adopted pursuant thereto; . . . ."

Schedules I through V list approximately 148 substances.

Defendant cites Stanford v. Texas, 379 U.S. 476, 85 S.Ct. 506, 13 L.Ed.2d 431 (1965), in which the items listed in the search warrant were, " . . . books, records, pamphlets, cards, receipts, lists, memoranda, pictures, recordings and other written instruments concerning the Communist Party of Texas and the operations of the Communist Party in Texas . . .". The Supreme Court of the United States reversed Stanford's conviction on the ground that it had been achieved by use of illegally seized evidence which should have been suppressed. The warrant, held the court, was a general warrant forbidden by the Fourth Amendment.

We would note, however, that the court in *Stanford* distinguishes situations involving First Amendment rights from situations not involving speech, press, religion or assembly.

"But while the Fourth Amendment was most immediately the product of contemporary revulsion against a regime of writs of assistance, its roots go far deeper.

.  .  .  .  .  .

"What is significant to note is that this history is largely a history of conflict between the Crown and the press. . . . In Tudor England officers of the Crown were given roving commissions to search where they pleased in order to suppress and destroy the literature of dissent, both Catholic and Puritan. In later years warrants were sometimes more specific in content, but they typically authorized the arrest and search of the premises of all persons connected with the publication of a particular libel, or the arrest and seizure of all the papers of a named person thought to be connected with a libel.

.  .  .  .  .  .

"In short, what this history indispensably teaches is that *the constitutional requirement that warrants must particularly de-*

*scribe the 'things to be seized' is to be accorded the most scrupulous exactitude when the 'things' are books, and the basis for their seizure is the ideas which they contain."* [Footnotes omitted.] [Emphasis ours.]

The items seized in *Stanford* were several hundred books, pamphlets and periodicals.

More appropriate to our situation is United States v. Fuller, 441 F.2d 755 (4th Cir. 1971). In that case, the warrant authorized search and seizure of "bookmaking records and wagering paraphernalia consisting of, but not limited to, accounting sheets, rundown sheets, betting slips, recap sheets, sports information papers, miscellaneous line notations, line sheets, books of account, checks, money orders, and United States Currency . . . ." During the search two of the agents executing the warrant answered telephone calls for almost half an hour. "The callers identified themselves by number and asked for the 'line'." The agents gave them the "line" information. Line referred to the predicted point spread between teams in athletic contests. The agents testified about these telephone conversations; and defendant argued that interception of the phone calls constituted a seizure. Since the telephone inquiries had not been listed on the search warrant, the defendant urged that they were seized in violation of the Fourth Amendment. The Fourth Circuit Court of Appeals held as follows:

"The description [of the items listed in the search warrant] is necessarily general and clearly contemplates that material relating to gambling activity but not precisely described might be seized. The intent of the generalized description is clearly to permit the seizure of any items directly related to the appellants' booking operation. The telephone calls answered by the agents were clearly a part of appellants' booking operation [,] and, therefore, we think within the scope of the general language of the warrant. [Footnote omitted.]

"Nor do we think that a warrant which is limited to the seizure of items which are directly related to a booking operation to be the kind of general search prohibited by the Fourth Amendment. This is not a case where 'the constitutional requirement that warrants must particularly describe the "things to be seized" is to be accorded the most scrupulous exactitude [because] the "things" are books, and the basis for their seizure is the ideas which they contain.' " [Citation omitted.]

Similarly, we think the opinion rendered in James v. United States, 416 F.2d 467 (5th Cir. 1969) undercuts appellant's reliance on *Stanford*. The search warrant in that case listed the items to be seized as: "gambling paraphernalia, including but not limited to dice, crap tables, wires, magnets, coils, solenoid switches, records, sales receipts, customers' lists, shipping orders, supplies, machine equipment, machine tools and hand tools for the manufacture of gambling paraphernalia, including but not limited to dice, crap tables and cards." One of the defendants in the *James* case sought to suppress various items seized at his home and manufacturing plant on the ground that the "search was a general exploratory one in violation of the Fourth and Fifth Amendments." The Court of Appeals held as follows:

"The search was for the instrumentalities involved. It was not general. It was not exploratory. The place to be searched and the items to be seized were as precisely identified in the warrant as the nature of the activity permitted. When circumstances make an exact description of instrumentalities, a virtual impossibility, the searching officer can only be expected to describe the generic class of items he is seeking."

█ We are of the opinion that the items to be searched for and seized in the case before us were as precisely identified in the warrant as the situation permitted considering the wide variety of drugs used

**418**

by addicts in the United States. The words, "controlled substances . . . contrary to law", used in the warrant have a definite meaning in that they refer to certain and definite lists of drugs and their derivatives. Nothing was left to the discretion of the Officers. They were commanded to seize any of the items on those lists present on the premises contrary to law, and nothing else. Heroin is one of the drugs listed, and it was heroin that the officers seized.

■ Finally, under defendant's first point, it is urged in the briefs that the manner in which the officers executed the warrant was improper. This contention appears to be based on the fact that the officers waited in front of the El Vicio headquarters until defendant arrived before they attempted to enter the premises. From this sequence, defendant concludes that the officers were somehow improperly motivated and that their execution of the warrant was in fact directed exclusively against this defendant. Suffice it to say that this theory of inadmissibility was never brought to the attention of the trial court, and, accordingly, defendant may not now raise it without first demonstrating plain error. See R.Evid. 103, § 20–4–103, N.M.S.A.1953 (Repl. Vol. 4, Supp.1973). The record as it comes before us would not support a finding of error and does not support defendant's contention that the search and seizure otherwise exceeded the limitations set forth in the warrant. Compare State v. Paul, 80 N.M. 521, 458 P.2d 596 (Ct.App.1969), cert. den., 80 N.M. 746, 461 P.2d 228 (1969), cert. den., 397 U.S. 1044, 90 S.Ct. 1354, 25 L.Ed.2d 654 (1970).

Defendant's second point, that there is not substantial evidence to support a conviction for "trafficking", is likewise without merit.

Although there was no direct evidence at trial that the defendant had sold, delivered or dispensed heroin, the quantity discovered in his possession amply supports an inference on intent from the circumstances attending possession.

■ The applicable rule may be stated as follows:

" . . . [T]he circumstantial evidence rule is not a concept independent of the question of whether there is substantial evidence to support the verdict. As stated in State v. Clements, 31 N.M. 620, 249 P. 1003 (1926): 'The rule in a circumstantial evidence case is but a special application of the general rule of reasonable doubt. The jury having been properly instructed as to defendant's rights, its decision is final if supported by substantial evidence. . . .'" State v. Madrid, 83 N.M. 603, 495 P.2d 383 (Ct. App.1972).

■ The evidence showed that defendant was in possession of more than thirty "caps" of heroin. Defendant contends that this evidence is not inconsistent with personal use and that therefore he would be innocent of the charge of possession with intent to distribute a controlled substance. However, it was adduced as part of the state's case that defendant was not, nor had he ever been, a heroin addict or user; the defendant testified to this. The only possible inference to be drawn from the evidence is that defendant, at the least, intended to *give* the heroin away. This evidence is sufficient to conclude that defendant was trafficking in heroin.

The judgment of the district court is affirmed.

It is so ordered.

HENDLEY, J., concurs.

SUTIN, J., dissents.

SUTIN, Judge (dissenting).

I dissent.

A. *The search warrant should be quashed because the items seized were not described in the warrant.*

The search warrant provides for the search for and seizure of "any and all controlled substances which may be kept there [headquarters of the El Vicio Methadone

Maintenance Program Organization] contrary to law."

This description violates the Fourth Amendment to the Constitution of the United States and Article II, Section 10 of the New Mexico Constitution. This is a matter of first impression in New Mexico.

The Fourth Amendment reads in pertinent part:

. . . [N]o Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and *particularly describing the . . . things to be seized.* [Emphasis added]

The New Mexico constitutional provision reads in pertinent part:

. . . [N]o warrant to search any place, or seize any . . . thing, shall issue without *describing the . . . things to be seized* . . . .. [Emphasis added]

(1) *The history of these provisions seek the protection of the guilty as well as the innocent.*

Our forefathers adopted the Fourth Amendment to avoid serious threats to basic liberties of our people and serious threats against precious aspects of our traditional freedom. Boyd v. United States, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886) sets forth the broad historic policy underlying the Fourth Amendment. This policy, as explained in *Boyd,* has been the guide to its interpretation. The Fourth Amendment was adopted to strangle writs of assistance issued in colonial days which empowered revenue officers to search suspected places for smuggled goods. A writ of assistance was called, by James Otis, the "worst instrument of arbitrary power, the most destructive of English liberty and the fundamental principles of law, that ever was found in an English law book". 116 U.S. at 625, 6 S.Ct. at 529, 29 L.Ed. at 749.

"The whole point about the Fourth Amendment is that 'Its protection extends to offenders as well as to the law abiding,' because of its important bearing in maintaining a free society and avoiding the dangers of a police state." Harris v. United States, 331 U.S. 145, 171, 67 S.Ct. 1098, 1111, 91 L.Ed. 1399, 1416–17 (1947), (Frankfurter, J., dissenting). "Of course, this, like each of our constitutional guaranties, often may afford a shelter for criminals. But the forefathers thought this was not too great a price to pay for that decent privacy of home, papers and effects which is indispensable to individual dignity and self-respect. They may have overvalued privacy, but I am not disposed to set their command at naught." 331 U.S. at 198, 67 S.Ct. at 1120, 91 L.Ed. at 1432, (Jackson, J., dissenting). See, also, Trupiano v. United States, 334 U.S. 699, 68 S.Ct. 1229, 92 L.Ed. 1663 (1948).

We should not be indulgent towards inroads upon the Fourth Amendment. In the words of Mr. Justice Holmes, speaking for the Court, the precious constitutional rights "against unlawful search and seizure are to be protected even if the same result might have been achieved in a lawful way." Silverthorne Lumber Co. v. United States, 251 U.S. 385, 392, 40 S.Ct. 182, 183, 64 L.Ed. 319, 322 (1920).

We must not reduce the Fourth Amendment merely to words, which can be circumvented with little effort, thus negating the protection it extends to the privacy of individual life.

(2) *The words "controlled substances" in the search warrant were not sufficient to identify the items to be seized.*

"The requirement of the constitutional provisions that search warrants shall particularly describe the thing to be seized necessitates a description of the property to be seized with such certainty as to identify it. . . ." 4 Wharton's Criminal Law and Procedure, § 1555 (Anderson ed., 1957), at 180.

We are confronted with the "Controlled Substances Act", § 54–11–1 et seq., N.M.S. A.1953 (Repl. Vol. 8, pt. 2, 1973 Supp.) which contains five schedules of controlled substances. Sections 54–11–29 and 54–11–30 provide for the issuance and execution

of "administrative inspection warrants". We do not determine the applicability of these sections to the present case; how-, ever, these sections can be looked to for guidance as to the appropriateness of a description of items included in the schedules of controlled substances, which are to be seized pursuant to a search warrant.

The purpose of §§ 54–11–29 and 54–11–30 is to broaden the power of government officials to enforce the provisions of the Controlled Substances Act. The legislature gave due concern to the necessity of describing, in the search warrant, the property intended to be seized. Because the Act contains five different schedules of drugs, § 54–11–30(B)(4) provides that the warrant shall "identify the items or types of property to be seized, if any".

The search warrant in the instant case did not "identify the items or types of property to be seized", nor did it make any reference to the Controlled Substances Act. It merely provided for seizure of "any and all controlled substances".

We have held that a search warrant is valid on its face, if it appears valid to an ordinarily intelligent and informed layman. Torres v. Glasgow, 80 N.M. 412, 456. P.2d 886 (Ct.App.1969). An intelligent and informed layman would not understand the meaning of "controlled substances" unless he were shown the Controlled Substances Act and he read and understood it. Even so, he would not know which items listed in the five schedules of controlled substances were the object of the search in the instant case.

A layman would know what "narcotics and dangerous drugs" are. These words have been held to be a description that is sufficient to identify the property to be seized. Weber v. Superior Court for County of Santa Clara, 30 Cal.App.3d 810, 106 Cal.Rptr. 593 (Ct.App. 1st Dist., 1973); People v. Henry, 173 Colo. 523, 482 P.2d 357 (1971); People v. Leahy, 173 Colo. 339, 484 P.2d 778 (1970); State v. Dimmer, 7 Wash.App. 31, 497 P.2d 613 (1972).

It is not necessary to give a detailed description such as chemical composition because that is too technical. United States v. Ketterman, 276 A.2d 243 (D.C.App. 1971).

The object of the Fourth Amendment provision which requires a description of the "things to be seized" is to prevent overbroad generalized searches and seizures. Bell v. State, 482 P.2d 854 (Alaska, 1971). General searches are invalid in New Mexico. State v. Paul, 80 N.M. 521, 458 P.2d 596 (Ct.App.1969).

I have uncovered no authority which has discussed the words "controlled substances" as used in a search warrant to identify the property to be seized. For cases which have held search warrants void because of overbroad language, see, Stanford v. Texas, 379 U.S. 476, 85 S.Ct. 506, 13 L.Ed.2d 431 (1965); People ex rel. McKevitt v. Harvey, 176 Colo. 447, 491 P.2d 563 (1971); State v. Johnson, 160 Conn. 28, 273 A.2d 702 (1970); Commonwealth v. Dorius, 346 Mass. 323, 191 N.E.2d 781 (1963); People v. Masters, 33 A.D.2d 637, 305 N.Y.S.2d 132 (A.D. 4th Dept. 1969).

The cases relied upon in the majority opinion are distinguishable from the instant case. United States v. Fuller, 441 F. 2d 755 (4th Cir. 1971) held that a warrant that authorizes the seizure of items directly related to a bookmaking operation is not a general search warrant that is prohibited by the Fourth Amendment. James v. United States, 416 F.2d 467, 473 (5th Cir. 1969) held that, "When circumstances make an exact description of instrumentalities, a virtual impossibility, the searching officer can only be expected to describe the generic class of items he is seeking."

We are not faced with analogous problems in the instant case; and even if we were, the generic class of items to be seized would be "narcotics and dangerous drugs", not "controlled substances".

The search warrant is unlawful, because it authorized a general search, in violation of the Fourth Amendment to the United

States Constitution; Article II, Section 10 of the New Mexico Constitution; and case law in New Mexico (*Paul*, supra).

(3) *The item named in the affidavit as the object of the search is not named in the search warrant.*

The affidavit of the police for a search warrant identifies heroin as the item covered by the Controlled Substances Act. Heroin is not mentioned in the search warrant. 1 Varon, Searches, Seizures and Immunities (1961), at 333, states:

> The law is clear that the person or place to be searched, as well as the property to be seized, must be particularly and sufficiently described in the search warrant. It is imperative to the validity of a search warrant that such descriptive requirement be obeyed.

> \* \* \* \* \* \*

> It must be remembered that the affidavit made and filed before the judicial authority contains a certain description, and a search warrant is predicated thereon, and adopts the description set forth in the affidavit, with the same degree of particularity and certainty of the averments made under oath.

> \* \* \* \* \* \*

> Thus, only those items which are mentioned in the affidavit, and adopted in the search warrant may be seized.

(4) *The search warrant placed discretion in police officers.*

We have adopted the rule that officers executing the warrant are not granted any discretion in selecting items to be seized. State v. Paul, supra.

El Vicio Methadone Treatment Center has legal authority to have Methadone on its premises. Methadone is a controlled substance. Section 54–11–7(B)(11). The warrant authorized a search "for any and all controlled substances which may be kept there contrary to law." Under the five schedules set forth in the Controlled Substances Act, there are about 120 differ-ent drugs set forth. The search warrant gave the officers unlawful authority to use their discretion in deciding what substances were kept there *contrary to law.*

B. *There is no evidence that defendant "trafficked" in a controlled substance.*

Defendant was charged with a violation of § 54–11–20, A which reads:

> As used in the Controlled Substances Act . . . "traffic" means the:

> \* \* \* \* \* \*

> (3) possession with intent to distribute any controlled substance enumerated in Schedules I or II which is a narcotic drug.

The evidence most favorable to the state shows that defendant was in possession of 30 caps of heroin, guesstimated to be between four and five grams, or about 0.155 ounces. Does this establish "intent to distribute"? There is no evidence in the record to establish or suggest that this amount of heroin is a typical amount for distribution by a seller. There is no evidence to establish how much heroin an addict might use each day, or might typically be carrying around with him. There is no evidence of attempted distribution by defendant to another, or of intent to distribute.

Defendant testified that he never sold heroin or other drugs. No conflicting evidence was presented.

In State v. Bowers, 87 N.M. 74, 529 P.2d 300 (Ct.App.1974), we held that possession of *246.15 pounds of marijuana, together with defendants' activities,* permitted an inference that defendants had the necessary intent to distribute and sustained a conviction for possession of marijuana with intent to distribute.

The only evidence relied on by the State in the instant case to infer an intent to distribute is defendant's statement that he was not an addict or user of heroin. This is flimsy evidence upon which to rest the conviction, given the standards we have established in *Bowers*, supra; State v. Mor-

eno, 69 N.M. 113, 364 P.2d 594 (1961); State v. Easterwood, 68 N.M. 464, 362 P.2d 997 (1961). Only by the broadest speculation and conjecture could the jury conclude that there was intent to distribute. State v. Romero, 67 N.M. 82, 352 P.2d 781 (1960).

We have continually held that when circumstantial evidence is relied on to prove essential elements of the crime, such evidence must point unerringly to the defendant's guilt, and must be incapable of explanation by any reasonable hypothesis of the defendant's innocence. State v. Malouff, 81 N.M. 619, 471 P.2d 189 (Ct.App.1970); State v. Zarafonetis, 81 N.M. 674, 472 P.2d 388 (Ct.App.1970); State v. Flores, 76 N. M. 134, 412 P.2d 560 (1966).

" . . . [T]he circumstantial evidence rule is not a concept independent of the question of whether there is substantial evidence to support the verdict." State v. Madrid, 83 N.M. 603, 605, 495 P.2d 383, 385 (Ct.App.1972); State v. Duran, 86 N. M. 594, 526 P.2d 188 (Ct.App.1974). The circumstantial evidence set forth above is not substantial evidence that defendant trafficked in controlled substances.

Although defendant may be guilty of possession of heroin, there is no evidence to sustain the conviction for possession with intent to distribute heroin.