930 P.2d 1165

**STATE of New Mexico, Plaintiff–Appellee,**

v.

**Kenneth JOHNSON, Defendant– Appellant.**

**No. 16554.**

Court of Appeals of New Mexico.

Oct. 18, 1996.

Certiorari Denied Nov. 25, 1996.

Tom Udall, Attorney General, Elizabeth Major Blaisdell, Special Ass't Attorney General, Santa Fe, for Plaintiff–Appellee.

T. Glenn Ellington, Chief Public Defender, Bruce Rogoff, Ass't Appellate Defender, Santa Fe, for Defendant–Appellant.

## OPINION

PICKARD, Judge.

1. Defendant appeals from his conviction for possession with intent to sell cocaine. He raises four issues on appeal: (1) there was insufficient justification for the police to take him to jail under the Detoxification Act, NMSA 1978, Sections 43–2–16 to 43–2–22 (Repl.Pamp.1993); (2) the police should not have forcibly removed his clothes and inventoried his belongings, leading to the discovery of the cocaine; (3) a mistrial should have been declared when a police officer commented on the results of other jury trials involving certain amounts of cocaine; and (4) there was insufficient evidence to prove that Defendant intended to sell the cocaine he possessed. We extensively discuss the issues of first impression under the Detoxification Act and the types of inventories permissible pursuant to detention thereunder. We discuss the other two issues summarily. We hold that, under the circumstances of this case, Defendant was properly taken to jail and the cocaine was properly found. We affirm.

FACTS

2. Officer Rodriguez stopped a vehicle driven by Charles McKee for a headlight violation. Defendant was a passenger in the vehicle. A check on the vehicle revealed that there was an outstanding warrant for the arrest of McKee. Officer Rodriguez requested assistance, and Officer Randall arrived as backup. Officer Rodriguez approached the vehicle on the driver's side while Officer Randall approached the vehicle on the passenger's side.

3. Officer Rodriguez asked McKee to step out of the vehicle and then attempted to arrest him. McKee hit Officer Rodriguez in the face and tried to run away. Officer Rodriguez chased McKee, caught him, ar-

rested him, and placed him in Rodriguez's squad car.

4. As Officer Randall approached the passenger side of the vehicle, Defendant said, "What the fuck are we doing?" According to Randall's testimony, Defendant's manner at this time was "not friendly." Defendant's speech was slurred, his eyes were bloodshot, and he smelled strongly of intoxicants. Defendant appeared to be intoxicated. Defendant was placed into the back of Randall's squad car. Defendant protested and was somewhat combative at the time that he was placed into the squad car.

5. The officers then searched the vehicle. They found a marijuana roach, rolling papers, and a loaded handgun. The handgun was stolen. McKee claimed that the handgun belonged to Defendant; Defendant claimed that it belonged to McKee.

6. Both men were transported to the jail. According to standard procedure, Defendant was asked to remove his clothing and replace it with jail clothing. This request was made three times, and Defendant refused each time. As a result, Defendant's clothing was forcibly removed. While the officers were removing Defendant's clothing, a plastic "Life Savers Holes" container fell out of one of the pockets. Inside the container officers found seven rocks of crack cocaine. Defendant was arrested and charged with trafficking a controlled substance by possession with intent to sell.

DISCUSSION

Justification for Taking Defendant to Jail

7. The Detoxification Act provides:

A. A peace officer or public service officer may transport an intoxicated person to his residence when it appears to the peace officer or public service officer that the intoxicated person will thereby become orderly and able to care for his own safety.

B. A peace officer or public service officer may transport an intoxicated person to the nearest health care facility within the county when it appears to the peace officer or public service officer that the intoxicated person is unable to care for his own safety or in need of medical attention.

C. A peace officer or public service officer may transport to the city or county jail an intoxicated person who has become disorderly when it appears that the intoxicated person:

(1) has no residence in the county in which he is apprehended; or

(2) is unable to care for his own safety; or

(3) constitutes a danger to others if not transported to the jail.

Section 43–2–18. Thus, the Detoxification Act allows an officer to transport to jail an intoxicated person who has become disorderly and either has no residence, is unable to care for himself, or constitutes a danger to others if not transported to jail. *See* § 43–2–18(C).

8. There is evidence in this case to support the transportation of Defendant to jail for becoming disorderly and for constituting a danger to others. Officer Randall was faced with a chaotic scene, with McKee battering Officer Rodriguez and attempting to evade the arrest. Defendant appeared to be intoxicated as evidenced by his bloodshot eyes, slurred speech, and the smell of intoxicants on him. Defendant used profane language while speaking in an unfriendly manner to Officer Randall. This behavior is sufficient to show that Defendant had become disorderly under the Detoxification Act. *See Black's Law Dictionary* 469 (6th ed. 1990) (disorderly defined as contrary to rules of good order and behavior; violative of public peace or good order; turbulent, riotous, or indecent); *Cesaroni v. Smith,* 98 R.I. 377, 202 A.2d 292, 296 (1964) (disorderly under statute is causing annoying or disturbing conditions; disorderly not defined as it is in crime of disorderly conduct). Although some courts have held to the contrary, *see Veiga v. McGee,* 26 F.3d 1206, 1212 (1st Cir.1994), we are not persuaded that the applicable canons of construction require the definition of disorderly in the Detoxification Act to be the same as it is in the crime of disorderly conduct. Indeed, if the definitions were the same, there would be no need for the Detoxification Act. The police would simply arrest disorderly intoxicated persons for the crime of disorderly conduct and take them to jail

for prosecution. The passage of an entire act, containing a hierarchy of responses to disorderly intoxicated persons, ranging from taking them home to taking them to jail, convinces us that "disorderly" as used in Section 43–2–18(C) has a different meaning from that in NMSA 1978, Section 30–20–1 (Repl.Pamp.1994). Additionally, detention pursuant to the Detoxification Act is expressly not criminal. Section 43–2–22(C). Thus, we hold that "disorderly" as used in the Detoxification Act has a meaning that is more in line with the dictionary definition. *See State v. Tabaha,* 103 N.M. 789, 791, 714 P.2d 1010, 1012 (Ct.App.1986) (legislature will not be presumed to enact useless legislation).

■ 9. Defendant argues that the statute requires the officers to choose the least drastic alternative. In other words, Defendant claims that the officers should have driven him to his home rather than transport him to jail. We agree that the Detoxification Act establishes a succession of alternatives, with incarceration being appropriate only where the others are not. But we do not agree with how Defendant would apply that choice to the facts of this case. The events in this case did not end once Defendant was placed in Officer Randall's squad car. Defendant became combative in the squad car, and the loaded, stolen gun was discovered. These additional factors when placed in the overall context of this case are evidence that might persuade a reasonable police officer that Defendant constituted a danger to others if he was not transported to jail. Therefore, under the Detoxification Act, the officers were justified in taking Defendant to jail. Under the circumstances of this case where Defendant was intoxicated and disorderly and constituted a danger to others, the least drastic choice under the statute was to transport Defendant to jail.

■ 10. Defendant claims that the officers did not have clear and convincing evidence that Defendant was disorderly or constituted a danger to others. "Clear and convincing evidence" is a standard to be applied in a tribunal, not on the street where officers work. *See Addington v. Texas,* 441 U.S. 418, 423–24, 99 S.Ct. 1804, 1807–08, 60 L.Ed.2d 323 (1979) (function of standard of proof is for adjudication purposes; "beyond a reasonable doubt" is used in criminal cases; "clear and convincing evidence" is used in certain civil cases; "preponderance of the evidence" is used for other civil cases). The standards utilized by officers in the street are couched in terms of "cause to believe." *See State ex rel. Schwartz v. Kennedy,* 120 N.M. 619, 627, 904 P.2d 1044, 1052 (1995) (officer had "reasonable grounds to believe" driver was under the influence of alcohol); *State v. Warren,* 103 N.M. 472, 476, 709 P.2d 194, 198 (Ct.App.1985) (officer may combine sensory perceptions with reasonable inferences drawn from circumstantial evidence to give rise to "probable cause"); *State v. Mann,* 103 N.M. 660, 663, 712 P.2d 6, 9 (Ct.App.1985) (officer may stop driver if he has a "reasonable suspicion" that a law has been or is being violated), *cert. denied,* 103 N.M. 740, 713 P.2d 556 (1986).

11. We can draw an analogy to the standard of "beyond a reasonable doubt" used in criminal cases. In a criminal case, an officer needs only probable cause to arrest. The officer does not, at the time of arrest, need information that would prove a crime was committed "beyond a reasonable doubt." The same should be true here—an officer must have only probable cause or reasonable grounds to believe that a person is disorderly, intoxicated, and dangerous. In this case, where Defendant was combative and used profanity, the officers had probable cause to believe that Defendant was disorderly. Defendant's appearance, demeanor, and smell of alcohol gave the officers probable cause to believe that he was intoxicated. The loaded gun, in conjunction with Defendant's combative behavior, gave the officers probable cause to believe that Defendant could also be dangerous.

■ 12. We note that it does not matter whether the officers had already decided to transport Defendant to jail before they searched the car and discovered the gun. *See Whren v. United States,* —— U.S. ——, ——, 116 S.Ct. 1769, 1774, 135 L.Ed.2d 89 (1996) (constitutional reasonableness of traffic stops does not depend on the actual moti-

vations of the individual officers involved; subjective intentions of the officers play no role in probable cause analysis); *State v. Apodaca,* 112 N.M. 302, 305, 814 P.2d 1030, 1033 (Ct.App.) (officer's subjective beliefs irrelevant), *cert. denied,* 112 N.M. 220, 813 P.2d 1018 (1991). Once the officers observed that Defendant was intoxicated and disorderly, they had the right to place Defendant in the squad car in order to take Defendant home. *See* § 43–2–18(A). By the time the officers took Defendant to jail for detoxification after the search of the car, they had ample reason to do so.

13. Finally, we emphasize that we are not holding that any intoxicated person can be taken to jail for detoxification. An officer's conduct is circumscribed by the requirements of the Detoxification Act. Only when these requirements have been met, as in this case, will an officer be allowed to transport an intoxicated person to jail rather than to the person's home or to a health care facility. *See* § 43–2–18.

Discovery of Cocaine

14. Defendant contends that, when an intoxicated person is taken into protective custody, police officers cannot remove that person's personal belongings, particularly small items that can fit inside a pocket. Even if police officers can take possession of such items for purposes of inventory, Defendant argues that the inside of the items cannot be searched under the guise of inventory.

15. Inventory searches are allowed as an exception to the warrant requirement. *See State v. Shaw,* 115 N.M. 174, 176, 848 P.2d 1101, 1103 (Ct.App.1993). Inventory searches must be reasonable and made pursuant to established police procedures. *Id.* An inventory search is reasonable if it is made to protect the arrestee's property, to protect police against claims of lost or stolen property, or to protect police from potential danger. *Id.* at 177, 848 P.2d at 1104. A search for purposes of making an inventory can include the search of containers so long as it is conducted according to established procedure. *Id.*

16. Defendant contends that parts of the Detoxification Act expressly do not permit intrusions such as would be permitted in ordinary arrest situations. *See* § 43–2–19 (officers may make protective search of intoxicated person "before transporting" person to residence, health facility, or jail); § 43–2–22(C) & (D) (person taken into protective custody is not arrested and shall not have criminal record). Thus, Defendant contends that the rules regarding inventories should not apply. We disagree.

17. The rationale behind inventory searches applies equally to criminal arrestees and civil detainees. *See State v. Friend,* 711 S.W.2d 508, 510–11 (Mo.1986) (en banc); *State v. Gelvin,* 318 N.W.2d 302, 306–07 (N.D.), *cert. denied,* 459 U.S. 987, 103 S.Ct. 341, 74 L.Ed.2d 383 (1982). In either situation, police officers face the same risks: possible claims for lost property or potential danger to either the officer, the person being detained, or others. The similarity is even more appropriate in some cases involving intoxicated persons who are under the protective custody of the police. Intoxicated persons who are taken to jail under the Detoxification Act, as in this case, are disorderly and may be a danger either to themselves or to others. For these reasons, the potential danger faced by police officers may be just as strong in civil detention cases as it is in cases involving criminal arrestees.

18. In this case, the officers testified that it was standard procedure to inventory all personal belongings of intoxicated persons brought in for detoxification. Also, it is reasonable for officers to conduct an inventory search of persons placed in jail cells in order to protect themselves from claims of lost property, as well as the potential harm faced by others, including the police, if a thorough search were not conducted. Therefore, it appears that an inventory search was warranted in this case.

19. Defendant also argues that the officers did not have the right to order him to undress and put on jail clothing. However, we need not address this issue. We have held that the inventory search of Defendant was proper. Even if Defendant had not been forcibly stripped, the Life Savers container

would have been discovered during a lawful inventory search. *See State v. Corneau,* 109 N.M. 81, 90, 781 P.2d 1159, 1168 (Ct.App.) (evidence that was seized unlawfully but would have been seized independently and lawfully in due course is admissible under inevitable discovery rule), *certs. denied,* 108 N.M. 668, 777 P.2d 907 (1989). Based on the testimony that it was standard procedure to conduct an inventory search on persons brought in for detoxification, the Life Savers container would have been discovered during the standard inventory search.

20. Defendant contends that the officers improperly opened the Life Savers container. We also need not decide this issue. The container, introduced at trial, was transparent and the rocks of cocaine were in plain view. When evidence is discovered because it is in plain view, there is no invasion of privacy and the discovery of the evidence does not constitute a search. *See State v. Williams,* 117 N.M. 551, 555–56, 874 P.2d 12, 16–17 (1994).

21. Defendant points out that the container was not introduced at the pretrial hearing on the motion to suppress. Defendant therefore argues that there was no evidence with respect to the doctrine of plain view. However, as we noted above, the container was introduced at trial. On appeal, we are not limited to the record made on a motion to suppress, but may review the entire record to determine whether there was sufficient evidence to support the trial court's denial of the motion to suppress. *See State v. Martinez,* 94 N.M. 436, 439, 612 P.2d 228, 231, *cert. denied,* 449 U.S. 959, 101 S.Ct. 371, 66 L.Ed.2d 226 (1980).

22. Defendant also argues that the only evidence introduced was that the officers searched the container, not that the officers discovered the cocaine in plain view. However, as we discussed above, an inventory search of Defendant's belongings was inevitable. During that search, the cocaine would have been in plain view inside the transparent Life Savers container. The inevitable discovery rule, therefore, applies to the search of the container as well as to the prior detection of the container. Moreover, once Defendant became subject to the inventory search when he was lawfully brought to the jail, he lost his expectation of privacy in the transparent container. *See Williams,* 117 N.M. at 555, 874 P.2d at 16.

**Issues Addressed Summarily**

23. Defendant, in attempting to impeach Detective Gartman, questioned him about the amount of crack cocaine that would be consistent with personal use. Defendant claims that Gartman's response, that "the maximum amount that I have seen somebody convicted of for possession is four rocks," entitled him to a mistrial. Even if the response was improper, it was not deliberately elicited by the prosecutor. In addition, the trial court immediately struck Gartman's response and admonished the jury to disregard it. *See State v. Vialpando,* 93 N.M. 289, 296, 599 P.2d 1086, 1093 (Ct.App.) (prompt admonition to jury to disregard testimony, particularly in light of lack of improper motive preceding testimony, cures any prejudicial effect), *cert. denied,* 93 N.M. 172, 598 P.2d 215 (1979).

24. Defendant claims that the evidence was insufficient to support a conviction for trafficking cocaine. Defendant argues that the amount of crack cocaine found was consistent with possession, not trafficking. However, Defendant denied that he used crack cocaine, admitted that he was unemployed, and had $157 in small bills in his possession when detained. *See State v. Quintana,* 87 N.M. 414, 418, 534 P.2d 1126, 1130 (Ct.App.) (evidence that defendant possessed over thirty caps of heroin but was not user of heroin was sufficient to support conclusion that defendant was trafficking in heroin), *cert. denied,* 88 N.M. 29, 536 P.2d 1085, *and cert. denied,* 423 U.S. 832, 96 S.Ct. 54, 46 L.Ed.2d 50 (1975).

**CONCLUSION**

25. Based on the foregoing discussion, we affirm Defendant's conviction.

26. **IT IS SO ORDERED.**

BOSSON and WECHSLER, JJ., concur.