STATE of Iowa, Appellee,

v.

Michael Dennis HAMILTON, Appellant.

No. 57263.

Supreme Court of Iowa.

Dec. 17, 1975.

Rehearing Denied Jan. 14, 1976.

Gary B. Garrison, Des Moines, for appellant.

Richard C. Turner, Atty. Gen., Thomas Mann, Jr., Asst. Atty. Gen., Ray A. Fenton, County Atty., and Francis X. Sarcone, Asst. County Atty., for appellee.

Heard by MOORE, C. J., and MASON, RAWLINGS, UHLENHOPP and HARRIS, JJ.

RAWLINGS, Justice.

Defendant appeals from judgment on jury verdict finding him guilty of possessing a controlled substance with intent to deliver (Section 204.401(1), The Code 1973). We affirm.

September 6, 1973, a United States Customs agent, using a dog trained to detect narcotics in mail shipments at Kennedy International Airport, New York, seized a package addressed to Mike *Hamton*, 3308 Crescent Drive, Des Moines, Iowa. The parcel was found to contain a quantity of hashish. After being resealed it was forwarded to Des Moines where a postal inspector and three policemen placed same in the hands of a regular mail carrier for delivery.

At the 3308 Crescent Drive residence, defendant Michael *Hamilton* answered the door. The mailman called his attention to the fact the name on the package was "Hamton", but defendant answered, "This is mine". He also, by signature, acknowledged receipt thereof. The carrier testified that after defendant closed the door he said, "Whoopee, the stuff is here".

A short time later peace officers entered the above designated premises with a previously obtained warrant authorizing them to there search for "hashish, a Schedule I controlled substance, and any and all controlled substances as defined in [Chapter] 204 of the 1973 Code of Iowa". Four or five people were in the house, including defendant.

After being informed the officers had a warrant to search for controlled substances, defendant surrendered the aforesaid parcel, claiming it had been mistakenly delivered to him. A federal narcotics agent testified, however, "Mr. Hamilton said he got a package in the mail and he thought it was sent by Mark Rynearson". Defendant was thereupon arrested and a prompt search of the premises followed. A number of letters addressed to defendant were immediately found in a bedroom dresser drawer. Four of them were seized and all but one bore

the return name and address "M. Rynearson, 485–72–4220, B Company, 2d 13th Infantry, APO New York, N.Y. 09028".

Numerous other items, including marijuana seeds, hashish pipes, hypodermic needles, a set of scales and other paraphernalia were also seized.

After defendant had been charged by information, he pled not guilty and, before trial, unsuccessfully moved to suppress evidential use of the aforesaid letters. They were later admitted over these defense objections: (1) "fruits of a wrongful search in that said search, while ostensibly pursuant to a search warrant, [was] in fact an inexcusable incursion and extension of said warrant" and (2) "hearsay as to the defendant". In support of a reversal it is now contended trial court reversibly erred in overruling these objections.

■ I. Conceding there was probable cause to search for the package of hashish, defendant first argues the warrant was overbroad in additionally authorizing a search for "any and all controlled substances" in that such constituted an impermissible "general warrant". Resolution of this issue requires us to determine whether (1) there was probable cause to search for "any and all controlled substances" and (2) such substances are described with sufficient particularity. These questions will be entertained in the order presented.

In *Coolidge v. New Hampshire*, 403 U.S. 443, 467, 91 S.Ct. 2022, 2038–2039, 29 L.Ed.2d 564 (1971), the court said:

"The second, distinct objective [served by the warrant requirement] is that those searches deemed necessary should be as limited as possible. Here, the specific evil is the 'general warrant' abhorred by the colonists, and the problem is not that of intrusion *per se*, but of a general, [exploratory] rummaging in a person's belongings. [Citations]. The warrant accomplishes this second objective by requiring a 'particular description' of the things to be seized."

Mindful thereof we look to decisions from other jurisdictions in order to ascertain whether authorization to search for "any and all controlled substances" made the instant warrant, to such extent, a proscribed "general warrant".

As might be expected, various courts have taken divergent positions on this subject. We are satisfied, however, *People v. McGill*, 528 P.2d 386 (Colo.1974) expresses the more rational, therefore preferable attitude. The affidavit in that case alleged an officer had personally seen marijuana plants growing in defendant's window. The warrant issued pursuant to this observation directed the police to search for "growing cannabis plants, commonly known as marijuana, narcotics, dangerous drugs, implements and paraphernalia involved in drug use". The attendant search produced numerous caches of marijuana, amphetamines and related equipment. The court thus framed one of the issues: "Whether facts set forth in the affidavit established probable cause for the issuance of a search warrant to search the defendants' apartments for evidence *apart from the marijuana plant*". (Emphasis supplied). *Id.* 528 P.2d at 388. Trial court suppressed all evidence other than the plants. In reversing, the Colorado Supreme Court said at 389:

"In short, the trial court would limit the reach of the search warrant to the items actually seen by the informant. This is too strict an application of probable cause. The magistrate could reasonably infer from the fact that three marijuana plants were growing in the house that there might also be marijuana seeds, stocks and the leaves, as well as the paraphernalia to use it for the purpose for which it was grown. [Citations].

"In *Johnson v. United States*, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948), Mr. Justice Jackson made this statement:

" 'The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement *the support of the*

*usual inferences which reasonable men draw from evidence.* Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime.'" (Emphasis in original).

Even more on point is this statement in *Weber v. Superior Court for County of Santa Clara*, 30 Cal.App.3d 810, 814, 106 Cal. Rptr. 593, 596 (1973):

"'A reasonable and prudent magistrate could infer that the consignee of contraband mailed from outside the United States would know that he was party to an illegal transaction and that, branded with such knowledge, it is reasonable to infer that the consignee possesses other contraband of foreign or domestic origin.'"

See also *People v. Hester*, 22 Ill.App.3d 118, 319 N.E.2d 301, 302 (1974); *People v. Singer*, 44 A.D.2d 730, 354 N.Y.S.2d 178, 180 (1974); *People v. Mangialino*, 75 Misc.2d 698, 348 N.Y.S.2d 327, 336 (1973); *State v. Eismann*, Or.App., 533 P.2d 1379, 1381–1382 (1975); 18 U.S.C.A. § 3103a; Fed.R.Crim.P. 41(b); § 751.3(9), The Code 1973.

We now conclude there was probable cause for issuance of the warrant authorizing a search for "any and all controlled substances" despite the ·fact affiant's personal knowledge may have been limited to contents of the package containing hashish.

This holding is accorded additional support in *State v. Oliveri*, 261 Iowa 1140, 1147, 156 N.W.2d 688, 692 (1968), where this court said:

"[W]hen a magistrate has found probable cause, reviewing courts are slow to invalidate the warrant by interpreting an affidavit or other information under oath furnished the magistrate in a hypertechnical rather than a realistic and commonsense manner. Doubtful or marginal cases in this area should be largely determined by preference to be accorded warrants. [Citation]. A grudging or negative attitude by reviewing courts toward warrants will tend to discourage police officers from submitting their evidence to a judicial officer before acting. [Citation]."

See also *State v. Hall*, 259 Iowa 147, 156, 143 N.W.2d 318 (1966).

■ II. The next related inquiry goes to validity of the warrant because it failed to describe "other controlled substances" with particularity.

Reduced to bare essentials we are called upon to determine whether the phrase "any and all other controlled substances" was so broad and vague it necessarily clothed the warrant-executing officers with interdicted discretion regarding items to be seized.

The New Mexico Court of Appeals recently dealt with this problem. In *State v. Quintana*, 87 N.M. 414, 534 P.2d 1126 (1975), the warrant authorizing a search of certain premises directed the officers to look for "any and all controlled substances which may be kept there contrary to law". In upholding the adequacy of this specification the court said, 534 P.2d at 1129–1130:

"We are of the opinion that the items to be searched for and seized in the case before us were as precisely identified in the warrant as the situation permitted considering the wide variety of drugs used by addicts in the United States. The words, 'controlled substances . . . contrary to law', used in the warrant have a definite meaning in that they refer to certain and definite lists of drugs and their derivatives. Nothing was left to the discretion of the Officers. They were commanded to seize any of the items on those lists present on the premises contrary to law, and nothing else."

See also *People v. Leahy*, 173 Colo. 339, 484 P.2d 778, 781 (1970); *State v. Olson*, 15 Or.App. 393, 515 P.2d 1342 (1973); 68 Am. Jur.2d, Searches and Seizures, §§ 81–82; 79 C.J.S. Searches and Seizures § 81c.

Under existing circumstances the instant search warrant was not subject to attack on the ground of generality or overbreadth. Consequently, it was not a proscribed "general warrant".

■ III. We come now to the controverted admission in evidence of the four letters found in a bedroom dresser drawer.

This case presents a classic example of a "mere evidence" seizure, countenanced by the United States Supreme Court in *Warden, Maryland Penitentiary v. Hayden*, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967). In that regard the test to be applied, 387 U.S. at 307, 87 S.Ct. at 1650, is thus stated:

"There must, of course, be a nexus—automatically provided in the case of fruits, instrumentalities or contraband—between the item to be seized and criminal behavior. Thus in the case of 'mere evidence,' probable cause must be examined in terms of cause to believe that the evidence sought will aid in a particular apprehension or conviction. In so doing, consideration of police purposes will be required."

It is also appropriate to here note the standard which has been generally applied since repudiation by *Hayden* of the "mere evidence" rule.

*Bell v. State*, 482 P.2d 854, 860 (Alaska 1972), quoted with approval in *Phenix v. State*, 488 S.W.2d 759, 767–768 (Tex.Cr.App. 1972) and *Chambers v. State*, 508 S.W.2d 348, 353 (Tex.Cr.App.1974), says:

"We think the rationale of *Harris* [*Harris v. United States*, 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399 (1947)] is equally applicable to the case where the search and seizure is carried out under the authority of a lawful search warrant. We can perceive no logical or constitutional reason, given a lawful entry pursuant to a search warrant by an officer who is conducting a good faith search, why the officer conducting the search should be prohibited from seizing evidence not described in the search warrant where the searching offi-

cer has a reasonable basis for drawing a connection between the observed evidentiary objects and the crime which formed the basis of the search warrant. We think it unrealistic in such circumstances to require the officer to obtain a second search warrant, particularly in a case where the location of the objects are already known and have for all practical purposes effectively been seized by the officer.

"We therefore hold that an officer may seize evidence of a crime even though such property is not particularly described in the search warrant when the objects discovered and seized are reasonably related to the offense in question, when the searching officer at the time of the seizure has a reasonable basis for drawing a connection between the observed objects and the crime which furnished the basis for the search warrant, and the discovery of such property is made in the course of a good faith search conducted within the authorized perimeters of the search warrant."

Factually similar to the case at bar is *People v. Sloss*, 34 Cal.App.3d 74, 83, 109 Cal.Rptr. 583, 588 (1973), and the court there observed:

"The mailing of the package of marijuana from Dave G. Olsen of Kragga Kamma, South Africa, justified a reasonable inference that other correspondence relating to the package, as well as paraphernalia for use and packaging of marijuana, would be on the premises. [Citation]. Finally, it has long been the rule that the seizure of evidence is not limited to contraband but includes 'mere' evidence, such as the correspondence. [Citations]."

See also *Taylor v. State of Minnesota*, 466 F.2d 1119, 1121 (8th Cir. 1972); *State v. Carter*, 161 N.W.2d 722, 727 (Iowa 1968); *State v. Wesson*, 260 Iowa 781, 785–786, 150 N.W.2d 284 (1967), quoted approvingly in *State v. Thomas*, 222 N.W.2d 488, 492 (Iowa

1974); *Commonwealth v. Fields*, Mass.App., 319 N.E.2d 461, 463–464 (1974).

As demonstrated, *infra*, we are satisfied there was a manifest nexus between the letters and the criminal activity in which defendant was engaged. No error attended seizure of the subject letters.

IV. Next entertained is the "hearsay" objection voiced by defendant regarding evidential use of said letters.

The State maintains they were admissible as an exception to the hearsay rule.

*Bailey v. Chicago, Burlington & Quincy Railroad Co.*, 179 N.W.2d 560, 566 (Iowa 1970) recognized, as such an exception, a declaration "against the *pecuniary or proprietary interest* of the uttering party at time the statement was made". (Emphasis supplied).

But we are now asked to extend that holding by adding thereto another exception element, i. e., statements against the *penal* interest of a declarant.

On this subject *State v. Everett*, 214 N.W.2d 214, 217–218 (Iowa 1974) is first noted. See also *People v. Brown*, 26 N.Y.2d 88, 308 N.Y.S.2d 825, 826–829, 257 N.E.2d 16, 17–19 (1970); *State v. Gardner*, 13 Wash.App. 194, 534 P.2d 140, 141 (1975); 5 Wigmore, Evidence, §§ 1476–1477, at 281–290 (3d ed. 1940); McCormick on Evidence, § 278 at 673–675 (2d ed. 1972); 31A C.J.S. Evidence § 219a, n. 30.5, at 608.

In any event, application of the "penal interest" factor would here be of doubtful worth because of prosecutorial failure to show testimonial unavailability of declarant Rynearson. See Rules 804(a)(4), (5) and (b)(4), Fed.R. Evidence, and Advisory Committee's Note. See also *People v. Brown*, *supra*. But see *People v. Spriggs*, 60 Cal.2d 868, 36 Cal.Rptr. 841, 845–846, 389 P.2d 377, 381–382 (1964).

On the other hand, it is to us apparent the letters were admissible in evidence as nonhearsay admissions by defendant through adoption of, or acquiescence in, the declarant's statements. See Rules 801(a)(1), (b) and (d)(2)(B), Fed.R. Evidence, and Advisory Committee's Note.

This does not mean we now overrule or dilute *State v. Menke*, 227 N.W.2d 184, 187–188 (Iowa 1975) and *State v. Kelsey*, 201 N.W.2d 921, 925–927 (Iowa 1972), in which this court repudiated the "tacit admission" rule.

Rather, as demonstrated *infra*, the aforesaid "adoption/acquiescence" and "tacit admission" precepts are distinguishable.

■ Like an oral accusatory statement in the presence of a person, mere possession of incriminating letters received from another party will not in itself create an admission by adoption or acquiescence. See *A. B. Leach & Co. v. Peirson*, 275 U.S. 120, 128, 48 S.Ct. 57, 57–58, 72 L.Ed. 194 (1927). In fact, admission by adoption or acquiescence can only be established, where justified, by the totality of circumstances viewed in terms of probable human behavior. See *H. v. H.*, 59 N.J.Super. 227, 157 A.2d 721, 725 (1959).

"[And] when it is shown by other proof that the information or advice in a letter was sanctioned by acceptance and was acted upon, to that extent such letter is competent evidence. *Packer v. United States*, 2 Cir., 106 F. 906. For general comment on the rule, see 80 A.L.R. 1244; 20 Am.Jur., Ev., § 568–572; 22 C.J.S. Criminal Law § 753. Wigmore discusses the principle thus: 'The written statements of a third person may be so dealt with by the party that his assent to the correctness of the statements may be inferred, and they would thus by adoption become his own statements. * * *. The party's possession of a document made by a third person may well be evidence of the party's knowledge of its contents.' 4 Wigmore on Ev., 3d Ed., § 1073." *Commonwealth v. Fusci*, 153 Pa.Super. 617, 35 A.2d 93, 96 (1943).

See also 29 Am.Jur.2d, Evidence, § 637 at 690; 31A C.J.S. Evidence § 297b at 763.

■ At this point it will be recalled defendant, when arrested, possessed a controlled substance recently forwarded to him by "M. Rynearson, 485–72–4220, B Company, 2d 13th Infantry, APO New York, N.Y. 09028".

Significantly, save and except Exhibit 8, *infra*, each questioned letter was found in an envelope bearing the name Rynearson with the same return address above set forth.

All of the letters must, of necessity, be set forth at length.

A. *PLAINTIFF'S EXHIBIT 8:*

"August 6

"Mike,

"I got your letter; it was good hearing from you again. Sorry for not writing you earlier. In this letter there is something important that I want to ask you. How would you like to have more smoke in town? I'd like to know if you'd like to go into business? Well, I've got a small quantity here of approx. 33 grams of red lebonese I want you to sell in grams so when you return the money I'll already have more coming, a larger quantity . . . Send a leter just soon as you have received the hash.

"About the table, I'm still looking, not to many stores have good tables, their are some good tables but not the best, I'll let you know.

"I got a letter from Howard the same afternoon I got your letter. I'm going to be writing him after this. I'm going to be writing him after this. It's nice when your friends keep in touch.

"Well 'Mike I hope you like the idea that I made and the partnership buddy! I think it's a good idea and I believe that we both could make quite a profit. If were both careful we can carry this thing out.

"Well write as soon as possible. Their are a lot of things I've got to do so I'll write when I get you Reply!

"Ryno"

B. *PLAINTIFF'S EXHIBIT 9:*
"MARS

"August 12

"Mike,

"I want you to write back and let me know if you got my package in the mail yet. And when you do get it write back and let me know right away. And if you like what you got, there is plenty more where that came from. And Mike if you get this letter before the package I sent you, just wait, I know it will make it to you, and in the name of Mike Hamton.

"Try to raise as much money as possible so I can send home a much larger quanity this next time.

"A Kilo of hash has gone up here in Germany to almost $1,000.00 but there are lower prices in other countrys in Europe that it is much lower and I want to be sending home Kilo's here soon if we can raise the money off these smaller quanites. So what we have to go on now is profit, so I can make a trip to one of these countries where the prices are better than Germany.

"Well hows everything going for you there in Des Moines, Done any more traveling this summer?

"Oh! some things I wanted to tell you Mike—the Rolling Stones will play here in Mannhiem, on September 3rd on a Monday night. I got my ticket yesturday for $7.00. Never have seen the Stones live. I'm glad they're coming.

"Well Mike I suppose I'll go now, remember to write me back and let me know. Now I'm going to write Dennis and Barb in with your letter—
"*Later*
"Mark Ryno"

C. *PLAINTIFF'S EXHIBIT 10:*

"August 15

"Mike,

"I got your letter yesterday afternoon, and I'm glad you were surprised to find what I sent you.

"Paul's scale was probably right on the wieght of 27. grams. And how did you like it?

"I read your letter good and there is a few things that I must tell you now, Mike.

"Things are changing fast here in Germany. For one, my biggest problem is money. To buy from the street in Germany you have to use their money to do so, so I have to go to a bank and change currency and with the dollar at what it stands at now is only 2.32 German Deutsche Mark's and prices are going up all over Europe too—so it would take big business to send you home a pound. I never met anyone in Frankfurt, Hieldelburg, or Mannhiem selling by pounds— they are 2.2 Kilo's, so they are twice ·as large and cost more (so maybe once's, but no pounds now.) In my next letter I'll send you prices of everything here.

"The other night I did a hit of L.S.D. and almost went to France with a couple of friends. Paris is about as far away as Chicago is from Des Moines (approx.)

"I got you money and tonight I will be leaving and going up to Frankfurt and see whats happenning up there.

"When I send some thing in the mail back home to you, I'm the one thats taking the chance, cause I would be the one to get busted, for international flight of drugs to the US. You would only be in court—and don't worry about losing your money—it is backed up with more.

"The only money I have besides your hundred dollars is about one hundred and fifty of my own and what I did send home cost $60.00/, if I would have been here a couple of years ago it would have cost half that much.

"I tell you what I could go for and thats some good pot, can't find it it here in Germany.

"While I'm in Frankfurt tonight I will look for some Black Hash—I hope to send some Black to you as soon as possible.

"(over)

"You will get something again in the mail real soon.

"Look Out
"Ryno"

D. *PLAINTIFF'S EXHIBIT 11:*

"August 28

"Mike,

"Whats going on buddy? I found some information on the fools ball table for you; look it over then send me back the papers alright.

"Well how are you and everyone back home? Did everyone that smoked that hash like it? I've still got your money and I should be going up to Frankfurt this weekend.

"The Rolling Stones play here in Mannhiem Monday September 2nd, which is Labor Day and I got a four day weekend also—do some more chemicals (I'm really getting into tripping again Mike).

"I've sent·you $60.00 worth of hash and the next I send—I'll write in the cost and weight.

"In with this letter is a picture of a city (cut off a postcard) of Hiedelberg—a town about a half hour drive—this is where I go when I get high with a couple of friends. In the picture on the right side of the river going up the mountain is a castel (alot of women there)

"Mike you ought to try to send one lid of marijuana, and use my family name. It would make it if you box it tight and Right! Try okay.

"next

"Debbie Persinger wrote and said high; it was the first I've heard for her since I've left town—sure good to hear from old friends.

"How have your mother and father been? Will you tell them both hi for me?

"Is Steve still in town or did he book somewhere again?

"I sure wish you could make it over here, you'd really enjoy yourself. I know you would. There are so many things I've seen on my time that I couldn't start to explain, you'd have to see these things yourself to really know.

"Well its getting late—tomorrow I've got to work—Be looking for a package soon.

"The Dark Side of the Moon,
"(Ryno)"

It is to us evident these communications clearly manifested (1) a continuing course of correspondence between defendant and Rynearson; (2) the carrying out of an illegal transaction or venture by these two parties over an appreciable period of time; (3) an absence of any disclaimer by defendant; and (4) a familiarity which invited freedom of correspondence and open discussion. See McCormick on Evidence, § 270 at 654 (2d ed. 1972).

Moreover, defendant's acceptance of the hashish sent to him by Rynearson provided other proof that the contents of said letters were sanctioned and acted upon by defendant. See *Commonwealth v. Fusci, supra.*

Viewed in the context of probable behavior, defendant's possession of the above quoted letters, coupled with at least an inferential active participation by defendant in Rynearson's criminous proposals, sufficed to create an adoptive or acquiescent admission by defendant of the declarant's statements. Thus the instant situation transcends the aforesaid "tacit admission" concept and its inherent element of passivity.

Finally brought into play is our rule to the effect "there is no reversible error if trial court's ruling which admitted the evidence in controversy may be sustained on any ground". *State v. Hinkle,* 229 N.W.2d 744, 748 (Iowa 1975). Stated otherwise, evidential use of the letters is upheld on the basis of the admission concept, *supra,* not as a hearsay exception. By the same token, applicability of the "penal interest" excep-

tion to the hearsay rule, as urged by the State, is neither reached nor resolved.

V. In summary we now hold (1) the warrant authorizing a search for "hashish * * * and any and all controlled substances * * *" was not an impermissible general warrant; (2) a sufficient nexus existed between the letters and criminal activity for which the warrant issued to justify seizure thereof; and (3) they were admissible in evidence under the admission by adoption or acquiescence concept.

The errors here asserted by defendant, upon which he seeks a reversal, are without merit.

Affirmed.