# IN THE COURT OF APPEALS OF IOWA

No. 18-1537
Filed April 15, 2020


**MIKE DEE, KRISS DEE, CHARLES DEPENA, STEVE FELTZ, JAMES FOGT, MARC GILLOTTI, MATT HELGESON, KARI HELGESON, JASON HELLICKSON, SUSAN HELLICKSON, BRAD KING, JILL KING, SURESH KOTA, BHAGYALAKSHMI ARVAPALLI, DAVID LACEY, SARAH LACEY, BRYAN LAMB, THEODORE J. LARE, KERSTIN LEVY, JEFF LORENZEN, SCOTT LUKAN, KARA LUKAN, THERESA A. MCCONEGHEY, ALAN R. MCCONEGHEY, BRIAN MEHLHAUS, LAURA MEHLHAUS, MARK MEYER, ANN MEYER, BRENT MITCHELL, NAGENDRA MYNENI, TIMOTHY NEUGENT, GERARD NEUGENT, KAAREN OLESEN, MICHAEL RIGGS, JOHN RIZZI, JOANNE RIZZI, TIM STEPHANY, TONTO HOLDINGS, LLC, SCOTT VANCE, HARV VANDER WEIDE, LOIS VANDER WEIDE, RAVI VEMULAPALLI, RANI MAKKAPATI, BUDDEMEYER INVESTMENTS, LLC, MICHAEL L. MCKINNEY, TODD MILBOURN, ELIZABETH MILBOURN, MAGNOLIA PARTNERS, LLC, MARK SLOCOMB TRUSTEE, MICHAEL MALLOY, JOAN MALLOY, TERESA JENSON, RON KING, NICK COLLISON, LUC DE TEMMERMAN, and ANN-MARIE UYTTERSPROT,**
　　　　Plaintiffs-Appellants,

**vs.**

**SETH BURGETT,**
　　　　Defendant-Appellee.
_____


　　　　Appeal from the Iowa District Court for Polk County, Michael D. Huppert, Judge.


　　　　Plaintiffs appeal the district court decision granting a directed verdict to defendant on their claims of fraud, breach of fiduciary duty, breach of contract, and promissory estoppel. **AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

Thomas D. Story and Sean P. Moore and of Brown, Winick, Graves, Gross, Baskerville & Schoenebaum, P.L.C., Des Moines, for appellants.

Thomas D. Hanson, Theodore W. Craig, Laura C. Wasson, and William M. Reasoner of Dickinson, Mackaman, Tyler & Hagen, P.C., Des Moines, for appellee.

Heard by Doyle, P.J., and Tabor and Schumacher, JJ.

**SCHUMACHER, Judge.**

Plaintiffs appeal the district court decision granting a directed verdict to defendant on their claims of fraud, breach of fiduciary duty, breach of contract, and promissory estoppel. The district court found there was sufficient evidence to present a claim of breach of fiduciary duty to the jury except for the element of damages. There was sufficient evidence of damages as to some of the plaintiffs, and the court erred by granting a directed verdict on breach of fiduciary duty as to those specific plaintiffs. We reverse and remand on this issue. We find no error by the district court in excluding Exhibit U, a proceeds model Excel spreadsheet. For the other claims—breach of contract, promissory estoppel, fraud, and breach of fiduciary duty to all other plaintiffs—the court did not err in granting a directed verdict.[1] We affirm the district court on these claims.

## I. Background Facts & Proceedings

Seth Burgett is the chief executive officer (CEO) of Verto Medical Solutions, LLC (VMS), a company that manufactured and sold Yurbuds, a type of headphones for athletes. Burgett owned forty-one percent of the shares of the company. Richard Daniels was the chief operating officer (COO). Craig Ceranna was the chief financial officer. The company was organized under an Operating Agreement.

Daniels became acquainted with Doug Vander Weide, a financial advisor, when Vander Weide was attending an Ironman triathlon in Hawaii and Daniels was

---

[1] The district court also granted a directed verdict as to all of defendant's counterclaims. The defendant does not appeal.

marketing Yurbuds. Vander Weide recommended VMS as an investment to several of his clients, and some of them became shareholders in VMS. One of the investors was Jason Hellickson, who became the shareholder representative on the board of directors for VMS. The other members of the board of directors were Ron King and Burgett.

In 2014, Harman International Industries, Inc. (Harman), purchased the assets of VMS in an Asset Purchase Agreement (APA). Harman agreed to pay $37,000,000, less a holdback of $3,700,000, which would be payable eighteen months after the sale date if certain provisions concerning indemnities, net working capital adjustment, and debt adjustment were met. In addition, the APA contained an earn-out provision that gave VMS the opportunity to earn $38,000,000 over a period of three years—2015, 2016, and 2017—if the sale of Yurbuds met specified targets for adjusted gross profits. Burgett received about $4,500,000 from the sale proceeds of $37,000,000, but he paid part of it to Daniels and Ceranna, leaving him with about $3,000,000. The shareholders received about $0.66 per $1.00 invested. Harman also hired Burgett to manage Harman's Verto division.

Burgett, as an individual, entered into two side agreements after the sale. From any holdback funds Burgett received under the APA, he agreed to pay Daniels and Ceranna a portion of the funds. For the shareholders who had not been made whole on their investment, on August 25, 2014, Burgett offered a Reallocation Agreement that stated Burgett would reallocate any funds he received from the APA earn-out provision to shareholders who entered into the agreement. The plaintiffs in this case all signed the Reallocation Agreement.

Eighteen months after the APA went into effect, Harman told VMS that VMS was not entitled to any funds under the holdback provision. On August 13, 2015, Harman also stated VMS would not receive any funds under the earn-out provision for 2015. The VMS board investigated filing suit against Harman because it disagreed with the determination that it would not receive any holdback or earn-out funds. Burgett was discharged from his employment with Harman on November 17, 2015.

In response to Harmon's position, VMS drafted a complaint against Harman. Harman responded that VMS owed it money for indemnification. Harman and VMS entered into negotiations for a settlement of holdback funds, earn-out funds, severance payments for Burgett, and indemnification. During the negotiation process, the board urged Burgett to consider any funds received in a settlement as earn-out funds so shareholders would receive the money, as many continued to be underwater in regard to their investment in VMS. Harman and VMS eventually entered into a settlement agreement where Harman would pay VMS $3,500,000. The settlement agreement stated, "For the avoidance of any doubt, Harman shall not owe [VMS] any Earn-Out payments pursuant to Section 2.4 of the APA under any circumstances." The VMS board approved the settlement, although there was no agreement within VMS as to how the funds would be allocated.

Burgett would not commit to an allocation scheme but stated he would not take any funds as severance payments. On January 23, 2016, Burgett sent an email to the board members, stating, "On the separation of remaining proceeds from earn-out to holdback, I now understand if you decide not to make that

decision, it will be on me to determine a fair and defendable position with my counsel on what the split would be." Corporate counsel for VMS, Christopher Reid, stated he did not believe the board could decide the allocation but it could make a recommendation. The board sent a recommendation to Burgett stating all the settlement proceeds should be considered earn-out funds.

During this process, several proceeds models were created by Daniel Niccum, an accountant who was an independent contractor for VMS. These proceeds models were in the form of Excel spreadsheets. The model produced varying results depending on the formulas plugged into the model, such as if the funds were allocated ninety percent to earn-out and ten percent to holdback, or fifty percent to earn-out, forty-one percent to holdback, and the rest to severance. On February 3, the VMS board approved a proceeds model with 100% of the settlement funds allocated as earn-out.

Burgett received the settlement funds on March 15 and immediately paid himself a severance payment of $290,000. He determined the remainder of the settlement proceeds should be considered holdback funds, rather than earn-out funds. With the settlement proceeds allocated as holdback funds, Burgett received about $1,200,000. Under his separate agreement with Daniels and Ceranna, he paid part of the $1,200,000 to them. The remaining $2,300,000 from the settlement proceeds was paid to shareholders under the terms of the Operating Agreement.

Hellickson and King, as the other board members for VMS, strenuously expressed their concerns to Burgett about his decisions. Within a short amount of time, Burgett agreed to return the severance payment to VMS for distribution to

shareholders. On April 11, Burgett fired Hellickson and King from the VMS board of directors.

On July 11, 2016, plaintiffs, who are shareholders who signed the Reallocation Agreement, filed an action against Burgett on theories of fraud, breach of fiduciary duty, breach of contract, and promissory estoppel. If the settlement proceeds had been allocated as earn-out funds, the shareholders who signed Reallocation Agreements would have received the $1,200,000 that went to Burgett.

A jury trial commenced on July 30, 2018. Burgett and Daniels testified the statement in the settlement agreement, "Harman shall not owe [VMS] any Earn-Out payments . . . under any circumstances," meant Burgett was prohibited from allocating the settlement proceeds as earn-out funds. Hellickson and King testified they believed the clause meant Harman would not owe earn-out payments for 2016 and 2017. Reid, corporate counsel for VMS, stated the settlement agreement did not classify the settlement proceeds as holdback, earn-out, or severance, and the settlement agreement took no position on how the funds should be allocated.

Vander Weide testified his clients as a whole were short about $810,000 on their investment in VMS. He testified that Hellickson was short $225,000; Mike and Kris Dee were short $11,000 to $12,000; John Rizzi was short $32,000; Nage Myeni was short $24,000 to $25,000; Jim Cantone was short $24,000; and Brad

and Jill King were short $24,000. Vander Weide could not recall specific amounts for his other clients who were plaintiffs.[2]

During the trial, the court admitted Exhibit 31, which was a proceeds model showing returns to investors if the allocation of the settlement proceeds had been ninety percent earn-out funds and ten percent holdback funds. The exhibit did not contain information correlating payment amounts to individual shareholders. The identifying information was in plaintiffs' Exhibit 45 and Burgett's Exhibit U, which were the same exhibit, and which we will refer to as Exhibit U. Exhibit U was an Excel spreadsheet that showed various returns for shareholders depending upon variables plugged into the spreadsheet. This exhibit was the heart of controversy at the five-day jury trial. Burgett attached Exhibit U to an email he sent to Richards and Niccum on March 10, 2016.[3] The email was admitted as an exhibit. The attachment, Exhibit U, was not admitted.

Exhibit U was on Burgett's proposed exhibits list prior to trial, but he elected not to submit the exhibit during the trial. Plaintiffs attempted numerous times to have the exhibit admitted.[4] Plaintiffs planned to call Niccum, who created the model, as a witness, but Niccum reported difficulties with air travel on his scheduled appearance day and did not attend any subsequent day of the trial.[5] During the course of the trial, Niccum signed a certificate pursuant to Iowa Rule of

---

[2] King and Hellickson were the only two plaintiffs called to testify. Vander Weide dismissed his claim prior to trial.

[3] The document name is Verto Proceeds Model v1.0_SETTLEMENT_3.10.16.xlsx.

[4] A physical copy of Exhibit U was exchanged on the third day of trial and was modified by plaintiffs to add information on the final day of trial.

[5] Niccum was not deposed prior to trial for an evidentiary deposition and was not subpoenaed for trial.

Evidence 5.902(11) stating Exhibit U was a record of a regularly conducted activity under Iowa Rule of Evidence 5.803(6). The court found the exhibit to be inadmissible hearsay, stating that although the March 20, 2016 email was admissible as an admission of a party opponent, it could not find the attachment to the email to be admissible on the same grounds. The court also determined the exhibit was not admissible under the business records exception.

At the close of evidence, Burgett filed a motion for directed verdict. The district court found there was no evidence of breach of the Reallocation Agreement as it was signed prior to the settlement agreement, so the Reallocation Agreement could not address the question of allocation of the settlement proceeds. On the issue of promissory estoppel, the court found there was no evidence Burgett promised the settlement proceeds would be allocated as earn-out funds or that Hellickson and King justifiably relied on a promise to their detriment.[6] For similar reasons, the court found there was no evidence of fraud. The court granted a directed verdict to Burgett on these claims.

The court determined Burgett, as the CEO, owed a fiduciary duty to the shareholders and there was sufficient evidence of breach of a fiduciary duty for the issue to be submitted to the jury. However, the court found:

> [A]t this stage of the proceedings, the record is insufficient to allow this jury to assess what any individual plaintiff—plaintiffs' damages are which would flow from the one issue that would otherwise be submitted to the jury, and that is the breach of fiduciary duty. Much has been said and many attempts have been made to put various models and assessments into the record. The only one which is part of any record that the jury might have a chance to look at would be Exhibit 31. That exhibit is inadequate to allow this jury to make the

---

[6] The claims of promissory estoppel and fraud pertained only to Hellickson and King.

somewhat involved analysis of what is to be done to get from breach to damage for one or more of any of the individual plaintiffs or Mr. King and Mr. Hellickson on their respective limited claims for fraud and promissory estoppel.

The court granted a directed verdict to Burgett on the claim of breach of fiduciary duty. The court then dismissed the jury. Plaintiffs now appeal.[7]

## II.    Breach of Fiduciary Duty

The district court found plaintiffs presented sufficient evidence of breach of fiduciary duty to submit the issue to the jury, except it concluded there was not sufficient evidence to submit the element of damages to the jury. *See* Iowa Civ. Jury Instr. 3200.1 (providing the elements of a claim of breach of fiduciary duty are a fiduciary relationship, breach of the duty, proximate cause, and damages). Vander Weide testified to the following damages amounts: (1) Hellickson, $225,000; (2) Mike and Kris Dee, $11,000 to $12,000; (3) John Rizzi, $32,000; (4) Nage Myeni, $24,000 to $25,000; (5) Jim Cantone, $24,000; and (5) Brad and Jill King, $24,000. For these specific plaintiffs there was sufficient evidence of damages and the court should have submitted the issue of breach of fiduciary duty to the jury. We reverse the district court's grant of directed verdict as to these plaintiffs.

## III.    Evidentiary Rulings

Plaintiffs claim the district court should have admitted Exhibit U, a proceeds model created to show the amount of all VMS shareholders' investments and the

---

[7] The electronic record is over 5000 pages and the appendix is over 800 pages. However, Plaintiffs' brief contains no reference to the record in the argument section. *See* Iowa R. App. P. 6.904(4) (requiring appellate briefs to contain references to the record).

proceeds they would receive under the settlement agreement. They state the exhibit was necessary to prove damages, as it would allow a showing of the amount each plaintiff invested in VMS and never received back. We review for the correction of errors of law rulings "to determin[e] whether statements come within an exception to the general prohibition on hearsay evidence." *Hawkins v. Grinnell Reg'l Med. Ctr.*, 929 N.W.2d 261, 265 (Iowa 2019).

A. Plaintiffs assert the exhibit should not be considered hearsay because it was an admission by a party opponent. An admission by a party opponent is not hearsay. Iowa R. Evid. 5.801(d)(2); *State v. Hanes*, 790 N.W.2d 545, 553 (Iowa 2010). A statement is not hearsay if it "is offered against an opposing party" and "[w]as made by the [opposing] party in an individual or representative capacity," or "[i]s one the [opposing] party manifested that it adopted or believed to be true." Iowa R. Evid. 5.801(d)(2)(A)–(B). The statements of a party opponent are excluded from the hearsay rule. *Pitts v. Farm Bureau Life Ins. Co.*, 818 N.W.2d 91, 108 (Iowa 2012).

"[T]he term adoptive admission is applied to evidence of other conduct of a party which manifests circumstantially the party's assent to the truth of a statement made by another person." *State v. Menke*, 227 N.W.2d 184, 188 (Iowa 1975) (citation omitted). There must be clear and unambiguous assent to a statement before it will be considered an adoptive admission. *Id.* "Admissions by adoption or acquiescence can only be established by 'the totality of circumstances viewed in terms of probable human behavior.'" *State v. Beckett*, 383 N.W.2d 66, 69 (Iowa Ct. App. 1985) (quoting *State v. Hamilton*, 236 N.W.2d 325, 330 (Iowa 1976)).

We previously stated:

> When hearsay accusations are sought to be introduced as evidence against a defendant in a criminal proceeding on grounds that the hearsay was "adopted" by defendant as an admission of his guilt, the trial court must first determine that the asserted adoptive admission be manifested by conduct or statements which are *unequivocal, positive,* and *definite* in *nature, clearly showing* that in fact defendant intended to adopt the hearsay statements as his own.

*Id.* (emphasis added in *Beckett*) (quoting *Village of New Hope v. Duplessie*, 231 N.W.2d 548, 553 (Minn. 1975)).

Adoption of a statement of another may be made by a clear statement of assent. *Iowa Supreme Ct. Attorney Disciplinary Bd. v. Noel*, 923 N.W.2d 575, 584 (Iowa 2019). Additionally,

> The written statements of a third person may be so dealt with by the party that his assent to the correctness of the statements may be inferred, and they would thus by adoption become his own statements. . . . The party's possession of a document made by a third person may well be evidence of the party's knowledge of its contents.

*Hamilton*, 236 N.W.2d at 330 (citation omitted). Furthermore, "[w]hile we have traditionally accepted admissions by silence or tacit admissions, we also stressed that because silence is often more ambiguous than verbal expression, tacit admissions should be received with caution." *State v. Paredes*, 775 N.W.2d 554, 570 (Iowa 2009).

In this case the issue arises as to whether an attachment to an email should be considered a statement of a party opponent or an adoptive admission. An email authored by a party is "not hearsay because it is an admission by a party opponent." *State v. Brouse*, No. 15-0638, 2016 WL 7395724, at *8, n.4 (Iowa Ct. App. Dec. 21, 2016). By attaching documents to an email, is a party making or

adopting the information in the attachments? Specifically, by attaching Exhibit U to an email, did Burgett adopt the information contained in Exhibit U?

A division of the Arizona Court of Appeals stated that a party's action of forwarding an email was not an adoption of the statements in the email. *Taylor-Bertling v. Foley*, No. 2 CA-CV 2013-0079, 2013 WL 12388549, at *3 (Ariz. Ct. App. Nov. 20, 2013). The court noted the party forwarding the email "made no statement of agreement and added no further explanation or comment." *Id*. In reaching this conclusion, the court discussed Arizona's evidentiary rule concerning a statement of an opposing party and the adoption of a statement.[8] *Id*.

Another court found emails sent by a defendant were "admissible as party-opponent admissions." *Paron Capital Mgmt, L.L.C. v. Crombie*, No. 6380-VCP, 2012 WL 214777, at *3 (Del Ch. Jan. 24, 2012). The court noted that notwithstanding the hearsay nature of the attachments to the email, which were "several financial projections," the attachments were admissible as the type of facts or data typically relied upon by experts. *Id*. Thus, the court determined the attachments were hearsay but came within an exception to the hearsay rule. *Id*.

We consider the totality of the circumstances in determining whether a party has adopted a statement. *Beckett*, 383 N.W.2d at 69. While a party's assent or

---

[8] On the other hand, the Texas Court of Appeals found an email and its attachments were admissible as admissions of a party opponent. *Direct Value, L.L.C. v. Stock Bldg. Supply, L.L.C.*, 388 S.W.3d 386, 391 n.5 (Tex. App. 2012), abrogated on other grounds by *Dudley Constr., Ltd. v. Act Pipe & Supply, Inc.*, 545 S.W.3d 532, 541 (Tex. 2018). The court found there was sufficient evidence of acceptance of a bid based on an email to which a purchase order and bid documents were attached. *Id*. at 391. The court cited the Texas equivalent of Iowa Rule of Evidence 5.801 but did not engage in a discussion as to why the email and attachments should be considered admissions of a party opponent. *See id.* at 391 n.4.

adoption of a statement of another must be clear and unambiguous, we may find an adoptive admission by circumstantial evidence. *Menke*, 227 N.W.2d at 188. A party's assent to a statement of another may be inferred from the surrounding circumstances. *See Hamilton*, 236 N.W.2d at 330.

Considering the totality of the circumstances, we conclude Burgett did not adopt Exhibit U. On March 10, Burgett sent Daniels and Niccum an email with the subject line, "Documents that generated proceeds—$199,828 and $85,727." There was no text to the body of the email. One of the attachments was Verto Proceeds Model v1.0_SETTLEMENT_3.10.16.xlsx. This attachment is the exhibit at issue, Exhibit U. Niccum, an independent contractor for VMS, created this document.[9] We conclude Burgett's attachment of the document, without any clear and unambiguous assent or adoption in the body of the email, did not constitute an adoption of the information in the document so as to be considered an admission by a party opponent. *See* Iowa R. Evid. 5.801(d)(2); *see also Menke*, 227 N.W.2d at 188; *Beckett*, 383 N.W.2d at 69. We conclude the district court did not err by determining the document was not admissible on this ground.

**B.** Because we have determined Exhibit U was hearsay, we next consider whether the district court erred by concluding the exhibit did not fit within the business record exception to the hearsay rule. Business records are a recognized exception to the hearsay rule. *GE Money Bank v. Morales*, 773 N.W.2d 533, 538 (Iowa 2009).

---

[9] VMS is not a party to these proceedings.

Under Iowa Rule of Evidence 5.803(6), a party must establish the following foundational elements in order to admit a document containing hearsay into evidence under the business records exception:

> (1) That it is a business record;
> (2) That it was made at or near the time of an act;
> (3) That it was made by, or from information transmitted by, a person with knowledge;
> (4) That it was kept in the course of a regularly conducted business activity;
> (5) That it was the regular practice of that business activity to make such a business record.

*State v. Reynolds*, 746 N.W.2d 837, 841 (Iowa 2008).

"While it is essential that the record be kept in the course of regularly conducted business activity, that fact alone is not dispositive; the record must also satisfy the other rule 5.803(6) conditions to establish admissibility of the hearsay statements in the record." *Id.* at 843. As noted in *Reynolds*, it is not enough for the document to be a business record. *See id.* A party seeking to show that a document comes within the business record exception must also show the document meets the other requirements to adequately establish the business record foundation for the documents. *Id.*

The plaintiffs did not lay a foundation for the admission of the attachment as a business record.[10] *See State v. Burgdorf*, 861 N.W.2d 273, 277 (Iowa Ct. App. 2014) (noting if there was not compliance with the "conditions precedent" for authenticating a document as a business record, the document was inadmissible). The plaintiffs did not show the record was "made at or near the time of an act"; "it was made by, or from information transmitted by, a person with knowledge"; "it

---

[10] The certification was provided to defendant on the fourth day of trial.

was kept in the course of a regularly conducted business activity"; or "it was the regular practice of that business activity to make such a business record."[11] *Reynolds*, 746 N.W.2d at 841. We determine the plaintiffs did not sufficiently establish the foundational elements for Exhibit U to be admitted under the business record exception.

**C.** Finally, we consider the assertion in the plaintiffs' reply brief that if strict application of the hearsay rule and business records exception prohibit admission of Exhibit U, the trial court should have permitted admission under a residual exception. We reject this argument, based on the trial court's rulings regarding hearsay and business records. Specifically, plaintiffs urge admission based on Exhibit U being reliable and necessary, and they urge that the jury should be able to use a laptop during deliberations to walk through the steps to populate damages. In their argument, plaintiffs compare the use of a laptop for the manipulation of various formulas to the use of overhead projectors to view exhibits. The plaintiffs appear to argue that their proposal to permit the jury to manipulate financial models is equivalent to the use of a monitor or overhead projector to view evidence. We disagree and reject this residual exception argument.

---

[11] Burgett testified during plaintiff's case that Exhibit U was created for purposes of litigation. *See Palmer v. Hoffman*, 318 U.S. 109, 114 (1943) (holding that accident report made by engineer following grade crossing accident was "calculated for use essentially in the court, not in the business" of railroad); *Jordan v. Binns*, 712 F.3d 1123, 1135-36 (7th Cir. 2013) (excluding insurance adjuster's report prepared after accident because "[l]itigation generally is not a regularly conducted business activity" and "documents prepared with an eye toward litigation raise serious trustworthiness concerns"); 7 Laurie Kratky Doré, *Iowa Practice Series: Evidence* § 5.803:6 (Nov. 2019 Update).

## IV. Directed Verdicts

We review the district court's ruling on a motion for directed verdict for the correction of errors at law. *Stender v. Blessum*, 897 N.W.2d 491, 501 (Iowa 2017). We consider "the evidence in the light most favorable to the resisting party." *Thornton v. Am. Interstate Ins. Co.*, 897 N.W.2d 445, 460 (Iowa 2017) (quoting *Johnson v. Farm Bureau Mut. Ins.*, 533 N.W.2d 203, 205–06 (Iowa 1995)). "Our role on appeal is to decide 'whether the trial court correctly determined [whether] there was sufficient evidence to submit the issue to the jury.'" *Dorshkind v. Oak Park Place of Dubuque II, L.L.C.*, 835 N.W.2d 293, 300 (Iowa 2013) (citation omitted). "[I]f reasonable minds can differ as to how the issue should be resolved, a jury question is engendered," making a directed verdict inappropriate. *Miranda v. Said*, 836 N.W.2d 8, 14 (Iowa 2013).

### A. Breach of Contract

In order to prove a breach-of-contract claim, a party must show:

> (1) the existence of a contract; (2) the terms and conditions of the contract; (3) that it has performed all the terms and conditions required under the contract; (4) the defendant's breach of the contract in some particular way; and (5) that plaintiff has suffered damages as a result of the breach.

*Iowa Mortg. Ctr., L.L.C. v. Baccam*, 841 N.W.2d 107, 110–11 (Iowa 2013) (quoting *Molo Oil Co. v. River City Ford Truck Sales, Inc.,* 578 N.W.2d 222, 224 (Iowa 1998)).

The district court found plaintiffs were claiming there was a breach of the Reallocation Agreement. On August 25, 2014, Burgett offered the Reallocation Agreement to shareholders who had not been made whole on their investment. The settlement agreement was dated February 24, 2016. The district court found

the Reallocation Agreement did not address the allocation of the settlement proceeds because the Reallocation Agreement was executed before the settlement agreement. The court also found the settlement agreement did not specify how the settlement proceeds should be allocated.

The court determined there was no evidence of a contractual obligation to allocate the settlement proceeds as earn-out funds instead of holdback funds. The court concluded:

> So there is nothing in this record that upon which this jury could conclude that Mr. Burgett was under an obligation pursuant to the Reallocation Agreements to treat the settlement proceeds in whole or in part as earn-out. Therefore, there is no evidence to show that he has breached the allocation—the Reallocation Agreements. For that reason, the defendant's motion for directed verdict as to the contract claim is granted.

We find no error in the district court's conclusion that neither the Reallocation Agreement nor the settlement agreement created a contractual obligation for Burgett to allocate the settlements proceeds as earn-out funds. We determine the district court did not err in granting a directed verdict to Burgett on plaintiffs' breach of contract claim.

## B. Promissory Estoppel

The elements of a claim of promissory estoppel are:

(1) a clear and definite promise; (2) the promise was made with the promisor's clear understanding that the promisee was seeking an assurance upon which the promisee could rely and without which he would not act; (3) the promisee acted to his substantial detriment in reasonable reliance on the promise; and (4) injustice can be avoided only by enforcement of the promise.

*Schoff v. Combined Ins. Co. of Am.*, 604 N.W.2d 43, 49 (Iowa 1999) (footnote omitted).

The district court stated "[T]he record is devoid of any evidence that would allow this jury to conclude that Mr. Burgett ever made a clear and definite promise that he would do anything regarding the settlement proceeds except treat those as 100 percent holdback." For this reason, the court concluded a directed verdict should be granted on the issue of promissory estoppel.

A claim of promissory estoppel must be based on a clear and definite promise. *Kunde v. Estate of Bowman*, 920 N.W.2d 803, 812 (Iowa 2018). There is no evidence in the record to show Burgett made a clear and definite promise to treat the settlement proceeds as earn-out funds. The district court did not err in granting Burgett's motion for a directed verdict on the claim of promissory estoppel.

### C.     Fraud

For a claim of fraud, a plaintiff must show

(1) defendant made a representation to the plaintiff, (2) the representation was false, (3) the representation was material, (4) the defendant knew the representation was false, (5) the defendant intended to deceive the plaintiff, (6) the plaintiff acted in reliance on the truth of the representation and was justified in relying on the representation, (7) the representation was a proximate cause of plaintiff's damages, and (8) the amount of damages.

*Holliday v. Rain & Hail L.L.C.*, 690 N.W.2d 59, 64 (Iowa 2004) (citing *Gibson v. ITT Hartford Ins. Co.*, 621 N.W.2d 388, 400 (Iowa 2001)). "Each element must be established 'by a preponderance of clear, satisfactory, and convincing proof.'" *Dier v. Peters*, 815 N.W.2d 1, 7 (Iowa 2012) (citation omitted).

The district court stated, "[T]he evidence is also devoid of anything that rises to the level of a representation upon which Mr. King and Mr. Hellickson would have relied in signing the settlement agreement with Harman." For this reason, the court granted a directed verdict on the fraud claim.

We find no error in the district court's conclusion. The evidence does not show Burgett made a representation concerning the allocation of the settlement proceeds that Hellickson and King relied upon to their detriment. We conclude the court did not err in granting Burgett's motion for directed verdict on the claim of fraud.

### V. Conclusion

The district court found there was sufficient evidence to present a claim of breach of fiduciary duty to the jury except for the element of damages. There was sufficient evidence of damages as to some of the plaintiffs as testified to by Vander Weide, and the court erred by granting a directed verdict on breach of fiduciary duty as to those specific plaintiffs. We reverse and remand on this issue. We find no error in the exclusion of Exhibit U as it was not an admission by a party opponent, a business record within the meaning of an exception to hearsay, or admissible as a residual exception. For the other claims—breach of contract, promissory estoppel, fraud, and breach of fiduciary duty to all other plaintiffs—the court did not err in granting a directed verdict. We affirm the district court on these claims.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**